20 P.3d 616

**In the Interest of Jane DOE,
Born on June 20, 1995.**

No. 21972.

Supreme Court of Hawai'i.

March 30, 2001.

James W. Walter, Mary Anne Mangier, and Jay K. Goss, Deputy Attorneys General, for the petitioner-appellee Department of Human Services on the writ.

MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ., and Circuit Judge MASUOKA, in place of ACOBA, J., recused.

Opinion of the Court by LEVINSON, J.

We granted the application for a writ of certiorari, filed by the petitioner-appellee Department of Human Services (DHS), in order to review the published opinion of the Intermediate Court of Appeals (ICA) in *In re Jane Doe, Born on June 20, 1995,* 95 Hawai'i 201, 20 P.3d 634, (Ct.App. 2000) [hereinafter, "the ICA's opinion"]. The ICA's opinion partially vacated the order of the family court of the first circuit, filed on July 30, 1998, and remanded for further proceedings. Among

other things, the family court's order (1) awarded permanent custody of Jane Doe to the DHS, (2) terminated Mother's parental rights, and (3) adopted the DHS's permanent plan—all pursuant to the Child Protective Act (CPA), *see* Hawai'i Revised Statutes (HRS) ch. 587 (1993 & Supp.2000).[1] We reverse the ICA's opinion and affirm the family court's July 30, 1998 order, as well as its order, filed on September 16, 1998, denying Mother's motion for reconsideration, and its concomitant findings of fact (FOFs) and conclusions of law (COLs), subsequently filed on November 10, 1998, because: (1) the CPA, contrary to the ICA's construction of it, is not "constitutionally infirm," insofar as it does not permit the termination of parental rights in the absence of clear and convincing evidence that a parent is "unfit" and, thus, does not deprive a parent of due process under either the United States Constitution[2] or the Hawai'i Constitution,[3] *see infra* section III.A; and (2) the family court's germane FOFs and COLs were not clearly erroneous, and, thus, the family court did not abuse its discretion in terminating Mother's parental rights, *see infra* section III.B.

## I. BACKGROUND

### A. Procedural History

Jane was born on June 20, 1995. A police officer assumed protective custody of her, which was relinquished to the DHS on June 21, 1995. On June 23, 1995, the DHS filed a petition in the family court that sought temporary foster custody of Jane. After a hearing, conducted in connection with the petition on July 10, 1995, the parties agreed, and the family court ordered, that Jane be returned

to Mother under the temporary family supervision of the DHS.

Numerous review hearings were conducted over the course of the next two and a half years. Eventually, on October 24, 1997, the DHS filed a motion, pursuant to HRS § 587–73(a) (1993), *see infra* section III.A, seeking permanent custody of Jane. On July 9, 1998, the family court convened a permanent plan hearing with regard to the DHS's motion, during which it received, without objection, thirty-eight DHS exhibits into evidence—comprised, for the most part, of reports prepared by the DHS, Jane's guardian ad litem (GAL), and other service providers, *see* HRS § 587–40 (1993 & Supp.2000)—and heard the testimony of four DHS witnesses, Jane's GAL, Mother, and Father. The family court also took judicial notice of "the related sibling's [sic] cases," *i.e.,* family court proceedings involving Jane's five maternal half-siblings over the course of the previous thirteen years.[4]

On July 30, 1998, the family court granted the DHS's motion, filing an order that, *inter alia,* awarded the DHS permanent custody of Jane, terminated Mother's and Father's parental rights, and implemented the DHS's permanent plan, the goal of which was for Jane to be adopted within one year. On September 16, 1998, without a hearing, the family court summarily denied Mother's motion for reconsideration. Subsequently, on November 10, 1998, the family court filed its FOFs and COLs.

Mother appealed; Father did not. On appeal, Mother argued that, inasmuch as she was not accused of physically abusing or physically neglecting Jane and was benefitting from services that were being provided

---

1. Relevant provisions of the CPA are discussed *infra* in section III.

2. "... No State shall ... deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. *See also Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (due process requires that termination of parental rights be justified by clear and convincing evidence supporting state's allegations).

3. "No person shall be deprived of life, liberty or property without due process of law[.]" Haw.

Const. Art. I, § 5 (1978). *See also Woodruff v. Keale,* 64 Haw. 85, 637 P.2d 760 (1981) (due process requires state to prove by clear and convincing evidence that severance of parent-child relationship is in the child's best interests; however, child's best interests, standing alone, is insufficient justification to terminate parental rights).

4. The family court's files relating to Jane's half-siblings have not been made a part of the record on appeal.

to her by the DHS until the DHS discontinued them, "the record ... demonstrate[d] that [the] DHS was programming Mother for failure by failing to provide the services it now says she could not benefit from." Mother posited that she was presently willing and able to provide a safe family home for Jane, with the assistance of a service plan, and that she had not been afforded a "full opportunity," during the three years after the permanent custody motion was filed, to demonstrate that she could do so. Finally, Mother argued that the family court had abused its discretion in denying her motion for reconsideration without first conducting a hearing.

In a sweeping ninety-six page opinion, the ICA eventually held that "there was no clear and convincing evidence that Mother was unwilling or unable to provide Jane with a safe family home and was thus unfit to retain her parental rights in Jane." ICA's opinion at 239, 20 P.3d at 672. The ICA also held, *sua sponte*, that various aspects of the CPA were "constitutionally improper." *Id.* at 237–239, 20 P.3d at 670–672. The DHS subsequently filed a timely application for a writ of certiorari, which we granted.

### B. *Mother*

The record reveals that, in 1988, Russell Loo, Ph.D., diagnosed Mother as exhibiting "Dependent Personality Disorder" (DPD), a diagnosis that he subsequently confirmed following a second psychological evaluation in 1996. Mother reported that, between the ages of ten and fourteen, she had been sexually and physically abused by her father (Grandfather). Dr. Loo noted that, during the second psychological evaluation, Mother "recognized somewhat hazily that her incestuous relationship influenced her to be submissive, nonassertive, and vulnerable to exploitation by others." According to Stephen J. Choy, Ph.D., a clinical psychologist who testified at the July 10, 1995 hearing, a person afflicted with DPD "has an extreme diffi-

culty making independent decisions" and, consequently, presents "a high risk of problems with neglect and poor judgment." Dr. Choy noted that a "person with [DPD] ... generally chooses spouses or relationships that are abusive in nature."

Mother has given birth to six children by four different men: (1) Daughter 1 by Father 1; (2) Sons 1, 2, and 3 by Father 2; (3) Daughter 2 by Father 3; and (4) Jane by Father. Notwithstanding that Grandfather physically and sexually abused Mother, she maintained contact with him and, eventually, Grandfather sexually abused Daughter 1.[5] Father 1, who himself had a history of domestic violence, reportedly physically abused Daughter 1; at the permanent plan hearing, however, Mother denied that Father 1 ever abused her or any of her children. Father 2 also sexually abused Daughter 1, as well as physically abusing Mother and Son 1.[6]

Mother met Father in 1993. In 1989, Father had sexually abused his nine-year-old daughter by a previous relationship, resulting in a criminal conviction pursuant to a no contest plea.[7] As of that time, Father had sired four other children, each of whom reported being physically abused by him. Father, like Mother, was raised in an abusive environment—his father had physically abused both him and his mother. After conducting a psychological evaluation on February 19, 1996, Dr. Loo diagnosed Father, *inter alia*, as exhibiting signs of "Antisocial Personality Disorder" in partial remission.

Father has continually denied that he sexually abused his first daughter or physically abused any of his other children. According to Father, his children lied because their mother was upset at him for physically assaulting either her boyfriend, according to one version, or her source of drugs, according to another. Similarly, Mother asserted that Father's children had told her that, at the instigation of their mother, they had lied

---

5. As of the convening of the permanent plan hearing, Grandfather had apparently died of cancer.

6. Father 2 was eventually convicted of sexually abusing Daughter 1 and was thereafter deported. As of 1996, however, Father 2 was apparently

under no legal disability from returning to the United States.

7. It appears that Father was incarcerated for two years and on probation for four years; by the time of the 1995 permanent plan hearing, Father was no longer on probation.

and continued to lie in order to protect her. In any event, according to the DHS's reports, Father "attribute[d] much of the inability to 'control' children to the inability to hit them," felt that children do not respect their parents, and expressed "disappointment that physical punishment cannot be used with children."

Although Mother testified at the permanent plan hearing to the contrary, the record reflects that, throughout the pendency of the present matter, she did not believe that Father posed a threat of harm either to herself or to her children. In spite of the fact that a condition of Father's probation, as well as of the family court's orders, required him to avoid contact with Mother's children unless supervised by someone other than Mother, Mother occasionally spent the night at Father's residence with Daughter 2, and, on one occasion, Mother permitted Father to remain in a room in which she was breastfeeding Jane. On another occasion, Mother, without informing the DHS, took the children to see Father during the holidays, reportedly because "she had to see him."

At the time Jane was born, Mother initially asserted that she would terminate her relationship with Father; however, Father was present at Jane's birth at Mother's request, Mother continued to maintain contact with him, and, subsequently, Mother and Father expressed a desire to be together as a family. Eventually, Mother reported that she and Father had broken up "for CPS." Thereafter, Mother reentered a relationship with Father 1, hoped that she, he, and the children could become a family unit again, and, during a supervised visit, informed the children that Father was no longer their "Daddy." Yet in April 1998, Jane's GAL reported that Mother had again asserted that she wanted Father to be involved in Jane's life and had shown the GAL a photograph, into which Father's image had been digitally inserted, of Jane's baptism, which he had not attended. Nevertheless, at the permanent plan hearing, Mother testified that Father would not be a part of her or Jane's life, although she also testified that she would telephone him so he could communicate with Jane and hoped that his supervised visitation with Jane would continue.

Mother's commitment to the various services offered to her in her other children's cases was ambivalent. By the time Jane was born, Daughter 1 was under DHS guardianship, and the other four children were all in the foster custody of the DHS. Although the record reflects that some of Mother's service providers in Jane's case occasionally noted that Mother appeared to be making progress and was improving her parenting skills, the record reflects just as clearly that Mother's participation in services during Jane's life continued to fluctuate, and, more importantly, that Mother failed to retain the skills that she was repeatedly taught, was unable to learn from past experiences, and lacked empathy for her children. DHS reports document, and the testimony of the DHS social worker assigned to Jane's case, Yami Kawaji Suzuki, recapitulated, that Mother was dishonest with service providers and the DHS regarding her participation in various services, the people she permitted to be members of her household and Jane's secondary caretakers, and her relationships with Father and Father 1.

In February 1998, Daughter 1 remained under DHS guardianship, and Mother agreed to assumption by the DHS of permanent custody over her other four children. Even though Mother asserted that she had acceded to permanent custody over the children so that she could focus on parenting Jane, subsequent DHS reports reflected that her involvement in services and attendance at supervised visits remained inconsistent. Indeed, in April 1998, Jane's GAL reported that Mother's progress since February "was not stellar" and that "[t]here is a continuing concern that she might not be able to internalize what she is being taught given the length of this case and the lack of progress."

Similarly, at the permanent plan hearing, Mother's therapist testified that Mother's progress had been minimal, due to her inconsistent attendance at therapy sessions, that Mother had failed to consider long-term consequences, that her insight was limited, that she could not provide a safe family home for Jane, and that for her to modify her behavior

would be "very, very difficult." Mother's social worker, Suzuki, likewise testified that Mother could not provide a safe family home for Jane—due, in part, to her persistent denial that Father posed a potential threat of harm and her consequent inability to demonstrate that she could adequately protect Jane—and that she would not become able to do so within a reasonable period of time.

We therefore believe that the ICA misconstrued the record in asserting that "the social workers, outreach workers, therapists, [and] nurses who had directly worked with Mother ... concurred that Mother ... was able to provide a safe home for Jane." ICA's opinion at 239, 20 P.3d at 672.

## C. *Jane*

The DHS returned Jane to Mother under family supervision on July 13, 1995, but resumed temporary foster custody of Jane on August 14, 1995, because Mother had been breastfeeding Jane in a room in which Father was also present, despite a family court order that Father not be permitted contact with Jane absent supervision by someone other than Mother. At a subsequent review hearing, the DHS asserted that, despite being ostensibly innocuous in isolation, the incident was reflective of Mother's failure to take seriously the DHS's concerns regarding Jane, as well as the family court's orders regarding contact with Father. Both Jane's GAL and the family court agreed with the DHS's assessment of the incident and, consequently, the family court ordered that Jane remain in DHS foster custody.

When Mother began substantially to comply, as required by the service plan then in effect, with the services that were offered to her, and because she was in jeopardy of being evicted from her subsidized housing if she continued to live alone without her children, Mother filed a motion with the family court, on December 12, 1995, seeking the return of her children under family supervision. The DHS and Jane's GAL agreed that family supervision of some, but not all, of Mother's children would be appropriate. Jane and Son 1 were returned to Mother's custody on December 20, 1995.

Over a year and half later, on September 16, 1997, the DHS again assumed temporary foster custody of Jane. Mother had left Jane in the care of Ann, a teenager living with Mother. When confronted with this episode of "inadequate supervision," Mother offered several different explanations regarding who Ann was, whether Ann indeed lived with her, and in whose care she had left Jane that day. The DHS filed a motion seeking foster custody of Jane; during the ensuing review hearing, the DHS maintained, in addition to the "inadequate supervision" incident, that Mother had not been in substantial compliance with the current service plan. Mother did not contest the DHS's motion; consequently, the family court ordered that Jane remain in the DHS's foster custody.

During the entire period of Mother's court-supervised custody of Jane, the record reflects that, initially, Mother met Jane's needs and generally complied with court-ordered service plans. Nevertheless, in late 1996 and early 1997, Jane began to manifest delays in her fine and gross motor skills and embarked upon a course of physical therapy sessions at the Parent Child Development Center (PCDC). During the same period, Jane also began to engage in temper tantrums, which increased in severity, during which she would flail around on her back, pound her head, and run into walls.

In June 1997, it was reported that Mother had begun to miss Jane's physical therapy appointments at PCDC. By September 1997, PCDC reported that Mother had failed to bring Jane to any appointments since mid-July 1997, despite PCDC's expressed concern about "environmental neglect" and Jane's developmental delays in her fine and gross motor skills, speech, and social skills. In addition, Mother failed to schedule a follow-up appointment with Jane's neurologist, even though she had reassured the DHS that she would do so. Mother also failed to keep two scheduled check-up appointments with Jane's pediatrician. Consequently, Suzuki "believed there was evidence of neglect" by Mother. We therefore, once again, believe that the ICA misconstrued the record in asserting that "none of the social workers, outreach workers, therapists, [or] nurses who had di-

rectly worked with Mother ever claimed that Mother had ... neglected Jane[, but, rather,] concurred that Mother was able to provide for Jane's physical needs[.]" ICA's opinion at 239, 20 P.3d at 672.

Mother failed to bring Jane to three scheduled visitations with Father in July and August 1997, a period of time during which Mother and Father had "broken up," cancelling the visits the morning of the scheduled day. She arrived late for two others.[8] Despite Mother's representations to the DHS that she was attending her therapy sessions, Mother's therapist reported that her attendance was sporadic and her prognosis poor.

After Jane was removed from Mother's custody in September 1997, it appears that she may have been physically abused in her initial foster home placement and, in any event, that her behavior and development were not improving. Consequently, in December 1997, the DHS placed Jane in a new foster home. Meanwhile, during the autumn of 1997, Jane had begun to exhibit "sexualized" behaviors inappropriate to her age. In spite of the foregoing, the reports prepared by Jane's GAL, Public Health Nurse, neurologist, new foster parents, and the DHS all noted that Jane's behavioral problems and developmental delays had significantly improved after her removal from Mother's custody.

Prior to being placed in her new foster home, the record reflects that Jane exhibited many of the same problems that were present in her siblings. Suzuki testified at the permanent plan hearing that Jane's development "mimicked ... [the] patterns of difficult behaviors and special needs of [Mother's] other kids," including "[b]ehaviors indicative of attention deficit disorder, of impulsivity, [and] of difficulty staying focused." Suzuki testified that Mother's other children, as in Jane's case, had improved when placed in foster homes. Jane's foster parents reported that, at the time she was placed with them in December 1997, she had

thrown severe tantrums, her vocabulary had consisted substantially of "no" and "dummy," her motor skills were poor (she fell often and walked clumsily), and her craving for food was insatiable, but she could not feed herself and, instead, simply "shoved food into her mouth." The foster parents further reported that Jane would "dig at anything," including scabs or scars, causing them to bleed, but would not shed a tear, and that Jane was hyperactive—these behaviors all improved dramatically within six months. Nonetheless, Jane regressed after each visit with Mother.

## II. STANDARDS OF REVIEW

### A. Certiorari From The Intermediate Court Of Appeals

Appeals from the ICA are governed by HRS § 602–59(b) (1993), which prescribes that an

application for writ of certiorari shall tersely state its grounds which must include (1) grave errors of law or of fact, or (2) obvious inconsistencies in the decision of the intermediate appellate court with that of the supreme court, federal decisions, or its own decision, and the magnitude of such errors or inconsistencies dictating the need for further appeal.

### B. Family Court Decisions

Generally, the "family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." *In re Jane Doe, Born on May 22, 1976,* 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996) (quoting *In re Jane Doe, Born on February 22, 1987,* 77 Hawai'i 109, 115, 883 P.2d 30, 36 (1994)) (internal quotation marks and citation omitted). Thus, we will not disturb the family court's decisions on appeal "unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant ... [and its] decision clearly exceed[ed] the bounds of rea-

---

8. With respect to one visit, Mother telephoned the visit supervisor and left a message to the effect that she was unable to attend because of a funeral. However, when the supervisor returned her call shortly thereafter, Ann answered the telephone and informed the supervisor that Mother had in fact left with Jane to attend the visit. The supervisor paged Mother, but Mother never returned the supervisor's page.

son." *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (quoting *Doe*, 77 Hawai'i at 115, 883 P.2d at 36) (internal quotation marks and citation omitted, brackets in original).

### C. *Family Court's Findings Of Fact And Conclusions Of Law*

The family court's FOFs are reviewed on appeal under the "clearly erroneous" standard. *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (citing *State v. Naeole*, 80 Hawai'i 419, 423 n. 6, 910 P.2d 732, 736 n. 6 (1996)). A FOF "is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citation omitted). " 'Substantial evidence' . . . is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (quoting *State v. Wallace*, 80 Hawai'i 382, 391–92, 910 P.2d 695, 704–05 (1996)); *see also State v. Kotis*, 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999).

On the other hand, the family court's COLs are reviewed on appeal *de novo*, under the right/wrong standard. *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (citation omitted); *see also Leslie v. Estate of Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999). COLs, consequently, are "not binding upon an appellate court and [are] freely reviewable for [their] correctness." *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (quoting *Wallace*, 80 Hawai'i at 391, 910 P.2d at 704).

However, the family court's determinations pursuant to HRS § 587–73(a) with respect to (1) whether a child's parent is willing and able to provide a safe family home for the child and (2) whether it is reasonably foreseeable that a child's parent will become willing and able to provide a safe family home within a reasonable period of time present mixed questions of law and fact; thus, inasmuch as the family court's determinations in this regard are dependant upon the facts and circumstances of each case,

they are reviewed on appeal under the "clearly erroneous" standard. *See In re John Doe, Born on September 14, 1996*, 89 Hawai'i 477, 486–87, 974 P.2d 1067, 1076–77 (App.), *cert. denied*, (March 17, 1999) (quoting *AIG Hawai'i Ins. Co. v. Estate of Caraang*, 74 Haw. 620, 629, 851 P.2d 321, 326 (1993) (internal quotation marks and citations omitted)); *see also In re Jane Doe, Born on June 4, 1987*, 7 Haw.App. 547, 558, 784 P.2d 873, 880 (1989). Likewise, the family court's determination of what is or is not in a child's best interests is reviewed on appeal for clear error. *See id.; Doe*, 89 Hawai'i at 486–87, 974 P.2d at 1076–77.

Moreover, the family court "is given much leeway in its examination of the reports concerning [a child's] care, custody[,] and welfare, and its conclusions [in this regard], if supported by the record and not clearly erroneous, must stand on appeal." *Id.* at 487, 974 P.2d at 1077 (quoting *Woodruff v. Keale*, 64 Haw. 85, 99, 637 P.2d 760, 769 (1981) (citing *In re Mary Doe II*, 52 Haw. 448, 454, 478 P.2d 844, 848 (1970), and *Turoff v. Turoff*, 56 Haw. 51, 55, 527 P.2d 1275, 1278 (1974))) (internal quotation marks omitted).

### D. *Credibility Of Witnesses*

". . . [I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." *State v. Jenkins*, 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000) (citations and internal quotation signals omitted) (brackets in original); *see also LeMay v. Leander*, 92 Hawai'i 614, 626, 994 P.2d 546, 558 (2000) ("This court has long observed that it is within the province of the trier of fact to weigh the evidence and to assess the credibility of witnesses, and this court will refrain from interfering in those determinations.") (Citation omitted.).

### E. *Statutory Interpretation*

"[T]he interpretation of a statute . . . is a question of law reviewable *de novo*." . . . *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara*, 81 Hawai'i 324, 329, 916 P.2d

1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied*, 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata*, 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied*, 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Director of the Court, State of Hawai'i*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto*, 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose. . . .

*Gray*, 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura*, 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*State v. Rauch*, 94 Hawai'i 315, 322–23, 13 P.3d 324, 331–32 (2000) (some citations omitted).

### F. *Constitutional Law*

". . . We answer questions of constitutional law 'by exercising our own independent judgment based on the facts of the case.' . . . Thus, we review questions of constitutional law under the 'right/wrong' standard." *Jen-*

*kins*, 93 Hawai'i at 100, 997 P.2d at 26 (citations omitted).

### III. *DISCUSSION*

The ICA's opinion contains "grave errors of law," within the meaning of HRS § 602–59(b), because its constitutional analysis is predicated upon a faulty construction of the CPA and is further grounded in a misapprehension of the record.

### A. *The ICA Misconstrued The CPA, And Its Constitutional Analysis Is Therefore Flawed.*

 The due process clause of the fourteenth amendment to United States Constitution requires that a state "support its allegations by at least clear and convincing evidence" before it may involuntarily divest a parent of his or her parental rights. *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Prior to *Santosky*, this court had held that the process due a parent during parental termination proceedings under HRS § 571–61, *et seq.*, obligated the state, *inter alia*, to adduce clear and convincing evidence that severance of the parent-child relationship was in the child's best interests. *See Woodruff*, 64 Haw. at 99–100, 637 P.2d at 769–70. We held in *Woodruff* that, in determining a child's best interests, the family court may "look to the past and present conditions of the home and natural parents so as to gain insights into the quality of care the child may reasonably be expected to receive in the future" and that "[o]ther factors for consideration may include the child's own desires and his [or her] emotional and physical needs." *Id.* at 99, 637 P.2d at 769.

 The ICA held that the CPA was "constitutionally infirm" because, contrary to the foregoing precedent, the act permitted the divestiture of parental rights at a permanent plan hearing "based upon a general determination that the 'child's family,' as opposed to the individual parent, is unable to provide the child with a safe family home" and, thus, did not require a finding, based on clear and convincing evidence, that a parent was in fact "unfit." ICA's opinion at 237, 20 P.3d at 670. Contrary to the ICA's view,

however, the CPA does *not* allow for the divestiture of parental rights absent clear and convincing evidence, adduced by the state, that the parent is "unfit," or, in other words, both that the parent is unwilling or unable to provide his or her child with a safe family home at the time a permanent plan hearing is conducted and that the parent will not become willing or able to do so within a reasonable period of time.

### 1. *The CPA*

The "ascendant purpose of the Child Protective Act is, rather redundantly, the protection of children." *Doe*, 84 Hawai'i at 51, 928 P.2d at 893. As we observed in *Doe*, the CPA is not to be construed or applied in a manner that would "significantly restrict the flexibility of the family court to respond appropriately to the varied circumstances of domestic situations." *Id.* Instead, the CPA should be construed liberally to "comport with the clear legislative mandate to provide 'prompt and ample' protection to children." *Id.* (quoting HRS § 587–1 (1993)); *see also* HRS § 587–1 (1993 & Supp.2000) ("This chapter shall be liberally construed to serve the best interests of the children and the purposes set out in this chapter.").

When the permanent plan hearing was conducted in the present matter, HRS § 587–73(a) provided in relevant part as follows:

> **Permanent plan hearing.** (a) At the permanent plan hearing, the court shall consider fully all relevant prior and current information pertaining to the safe family home guidelines, as set forth in [HRS § ] 587–25 [ (1993) ], including, but not limited to, the report or reports submitted pursuant to [HRS § ] 587–40, and determine whether there exists clear and convincing evidence that:

(1) The child's legal mother ... [is] not presently willing and able to provide the child with a safe family home, even with the assistance of a service plan;

(2) It is not reasonably foreseeable that the child's legal mother ... will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time which shall not exceed three years from the date upon which the child was first placed under foster custody by the court;

(3) The proposed permanent plan will assist in achieving the goal which is in the best interests of the child; provided that the court shall presume that:

(A) It is in the best interests of a child to be promptly and permanently placed with responsible and competent substitute parents and families in safe and secure homes; and

(B) The presumption increases in importance proportionate to the youth of the child upon the date that the child was first placed under foster custody by the court[.]

Pursuant to HRS § 587–73(b) (1993), once the family court determines that the foregoing criteria are established by clear and convincing evidence, the court "shall order," *inter alia*, that "permanent custody be awarded to an appropriate authorized agency," such as the DHS, and that "an appropriate permanent plan be implemented concerning the child." [9] HRS §§ 587–73(b)(2) and (3).

"Permanent custody" is statutorily defined and, among other things, "divests from each

---

9. HRS § 587–73(e) (1993), which, effective July 1, 2000, was deleted from the statute, *see* 2000 Haw. Sess. L. Act 78, §§ 1 and 3 at 155–57, but was in effect at the time the permanent plan hearing was conducted in the present matter, provided that "[t]he court shall order a permanent plan for the child within three years of the date upon which the child was first placed under foster custody by the court, if the child's family is not willing and able to provide the child with a safe family home, even with the assistance of a service plan." Inasmuch as Mother's parental rights were divested pursuant to HRS §§ 587–73(a) and (b), rather than HRS § 587–73(e), the latter provision is immaterial to the disposition of Mother's appeal. Moreover, the ICA's constitutional analysis was not predicated upon HRS § 587–73(e) but, rather, upon its construction of HRS § 587–73(a). Thus, insofar as HRS § 587–73(e) is not implicated by the present matter, we express no opinion regarding its validity when it was in effect.

legal custodian and family member who has been summoned pursuant to [HRS § ] 587–32(a) [ (1993) ], and vests in a permanent custodian, each of the parental and custodial duties and rights of a legal custodian and family member[.]" HRS § 587–2 (1993). Thus, Mother having been appropriately summoned and made a party in the present matter, the family court's permanent custody order divested her of her parental rights in Jane pursuant to the foregoing statutory provisions.

The CPA defines "family" to mean

each legal parent, the natural mother, the natural father, the adjudicated, presumed, or concerned natural father as defined under [HRS § ] 578–2 [ (1993) ], consanguinity or marriage, each person residing in the same dwelling unit, and any other person who or legal entity which is a child's legal or physical custodian or guardian, or who is otherwise responsible for the child's care, other than an authorized agency

which assumes such a legal status or relationship with the child under this chapter.

HRS § 587–2. "Family home" is statutorily defined to mean "the home of the child's legal custodian where there is the provision of care for the child's physical and psychological health and welfare." *Id.* "[S]afe family home guidelines," consisting of fourteen criteria, are set forth in HRS § 587–25,[10] which, "[a]t the permanent plan hearing, the court shall consider fully[.]" HRS § 587–73(a). Nothing in the CPA, however, suggests that any one of the fourteen criteria set forth in the safe family home guidelines, standing alone, is dispositive of whether the family home is or is not "safe." Rather, as applicable to a permanent plan hearing, they are, as denominated, only "guidelines," channeling the family court's assessment of the child's circumstances, including the nature of the family home provided or foreseeably to be provided by the child's parent or parents.

"Safe family home" is not statutorily defined, yet the foregoing provisions, construed

---

**10.** HRS § 587–25 provides in relevant part as follows:

**Safe family home guidelines.** (a) The following guidelines shall be fully considered when determining whether the child's family is willing and able to provide the child with a safe family home:

(1) The current facts relating to the child which include:
...
 (B) Psychological, medical[,] and dental needs;
...
(2) The initial and any subsequent reports of harm and/or threatened harm suffered by the child;
(3) Date(s) and reason for child's placement out of the home . . .;
(4) Historical facts relating to the alleged perpetrator and other appropriate family members who are parties which include:
...
 (B) How they were parented;
 (C) Marital/relationship history; and
 (D) Prior involvement in services;
(5) The results of psychiatric/psychological/ developmental evaluations of the child, the alleged perpetrator[,] and other appropriate family members who are parties;
(6) Whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the family home;
...
(8) Whether the alleged perpetrator(s) has acknowledged and apologized for the harm;
(9) Whether the non-perpetrator(s) who resides in the family home has demonstrated

the ability to protect the child from further harm and to insure that any current protective orders are enforced;
(10) Whether there is a support system of extended family and/or friends available to the child's family;
(11) Whether the child's family has demonstrated an understanding and utilization of the recommended/court ordered services designed to effectuate a safe home for the child;
(12) Whether the child's family has resolved or can resolve the identified safety issues in the family home within a reasonable period of time;
(13) Whether the child's family has demonstrated the ability to understand and adequately parent the child especially in the areas of communication, nurturing, child development, perception of the child and meeting the child's physical and emotional needs; and
(14) Assessment (to include the demonstrated ability of child's family to provide a safe family home for the child) and recommendation.

(b) The court shall consider the likelihood that the current situation presented by the guidelines set forth in subsection (a) will continue in the reasonably foreseeable future and the likelihood that the court will receive timely notice of any change or changes in the family's willingness and ability to provide the child with a safe family home.

in light of the CPA's stated purpose, clarify that a safe family home is a family home in which the child's parents or legal custodian can adequately provide for the child's physical and psychological health and welfare and thereby adequately protect the child from harm, be it actual, imminent, or threatened. *See* HRS § 587–1 (1993 and Supp.2000) ("This chapter creates within the jurisdiction of the family court a child protective act to make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm. . . . The policy and purpose of this chapter is to provide children with prompt and ample protection from the harms detailed herein, with an opportunity for timely reconciliation with their families if the families can provide safe family homes."); HRS § 587–2 (defining "harm," "imminent harm," and "threatened harm"); HRS § 587–11 (1993) (providing for jurisdiction in a child protective proceeding concerning any child who, *inter alia*, "is a child whose physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm").

### 2. *The CPA is not "constitutionally improper."*

The ICA construed the foregoing provisions of the CPA as authorizing the divestiture of parental rights at a permanent plan hearing "based upon a general determination that the 'child's family,' as opposed to the individual parent, is unable to provide the child with a safe family home." ICA's opinion at 237, 20 P.3d at 670. This, of course, the ICA held the family court cannot do. *Id.; see Santosky,* 455 U.S. at 747–48, 754–70, 102 S.Ct. 1388; *Woodruff,* 64 Haw. at 99–100, 637 P.2d 760. Additionally, the ICA held, "in light of *Woodruff* [, 64 Haw. at 99, 637 P.2d 760,] and *Santosky* [, 455 U.S. at 760 & n. 10, 102 S.Ct. 1388], that it is improper at an HRS § 587–73 permanent plan hearing to order a divestiture of parental rights based primarily on a determination that it is in the 'best interests of the child' to do so." ICA's opinion at 237, 20 P.3d at 670. Contrary to the implication of the foregoing holdings, however, the CPA does not authorize the divestiture of parental rights based, without more, on a determination either that the child's *family* is unable to provide the child with a safe family home or that divestiture is in the child's best interests.

As noted above, the focus of a permanent plan hearing conducted pursuant to HRS § 587–73(a) is whether the child's "mother" or "father" can provide a safe family home. *See* HRS § 587–73(a)(1). If not, the focus shifts to whether it is reasonably foreseeable that the child's "mother" or "father" will become willing and able to provide a safe family home within a reasonable period of time. *See* HRS § 587–73(a)(2). Only after the family court has found, by clear and convincing evidence, that neither criteria has been established, does the court then consider whether the proposed goal of the permanent plan is in the best interests of the child. *See* HRS § 587–73(a)(3).

Although the family court, pursuant to the safe family home guidelines, may fully consider relevant aspects of the child's family in assessing the child's life circumstances, including the role that any given family member may play in the child's family home, HRS §§ 587–73(a)(1) and (2) unambiguously require that the family court ultimately find that the child's *parent* cannot provide, and will not become able to provide, the child with a safe family home as a precondition to terminating the parent's rights and duties in the child via a permanent custody order. Thus, the plain language of the CPA precludes the divestiture of parental rights, pursuant to HRS §§ 587–73(a) and (b), upon a finding that the child's "family" is unable to provide him or her with a safe family home.

Nor does the CPA permit the divestiture of parental rights based solely upon a determination that it is in the child's best interests to do so. As the ICA itself noted, the criteria set forth in HRS §§ 587–73(a)(1) and (2), if established, constitute a finding that the parents are, in essence, "unfit." *See* ICA's opinion at 80. Unless there is clear and convincing evidence that the parents are "unfit," on the bases that they are unwilling or unable to provide a safe family home and there is no reasonable foreseeability that they will become willing and able to do so

within a reasonable period of time, the family court, pursuant to the CPA, may neither award the DHS permanent custody of a child nor terminate the parental rights and duties of the child's parents. *See* HRS §§ 587–73(c) and (d); *see also* HRS §§ 587–71(b) (providing that, "[i]f the court determines that the child's family is presently willing and able to provide the child with a safe family home without the assistance of a service plan, the court shall terminate jurisdiction") and 587–71(c) (providing that, "[i]f the court determines that the child's family home is a safe family home with the assistance of a service plan, the court shall[, *inter alia*,] place the child and the child's family members who are parties under the family supervision of an authorized agency[ and] return the child to the child's family home").

 Moreover, the plain language and sequence of the subsections of HRS § 587–73 unambiguously reflect that the "best interests" standard set forth in HRS § 587–73(a)(3) is not directly implicated in the family court's assessment and application of the criteria set forth in HRS §§ 587–73(a)(1) and (2), which, as we have indicated, pertain to

the question of parental "unfitness." Rather, HRS § 587–73(a)(3) directs the family court to consider "the best interests of the child" in the context of "achieving the goal" of the proposed permanent plan, which could entail (1) adoption, (2) guardianship, or (3) permanent custody until the child is adopted, placed under guardianship, or reaches the age of majority, *see* HRS § 587–73(b)(3).[11] Thus, the CPA does not, as the ICA's opinion seems to hold, authorize the family court to divest a parent of his or her parental rights "primarily on a determination that it is in the 'best interests of the child' to do so."[12] Indeed, by focusing the family court's inquiry at a permanent plan hearing first on the parents' willingness and ability to provide a safe family home, HRS §§ 587–73(a)(1) and (2) adequately require the court to consider the parents' rights before terminating them.

The ICA's construction of the CPA prompted the further holding that "it is constitutionally improper for a permanent custody order to be entered divesting a parent of his or her parental rights in a child, based solely on the parent's failure to strictly comply with a court-ordered service plan over a reasonable period of time." ICA's opinion at

---

11. Of course, we agree with the general principle, invoked by the ICA and which we have set out before, that the "best interests" standard alone does not support a divestiture of parental rights. *See Woodruff,* 64 Haw. at 99, 637 P.2d at 769 ("parental rights cannot ordinarily be terminated for the sole reason that it would be in the child's best interests"). The "parents' rights must be considered—be it in [a] finding of parental consent, culpability[,] or incapacity—before natural ties may be severed over their objections." *Id.* (discussing dictum in *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978)).

12. We also disagree with the ICA's holding that "the statutory presumption in favor of substitute parents and families at the permanent plan hearing is constitutionally improper." ICA's opinion at 238, 20 P.3d at 671. The statutory presumption that the child's best interests coincide with "prompt[ ] and permanent[ ]" placement with "responsible and competent substitute parents and families in safe and secure homes," HRS § 587–73(a)(3)(A), arises only after the family court has determined, pursuant to HRS §§ 587–73(a)(1) and (2), that the child's natural and legal parents are unwilling and unable to provide a safe family home and that it is not reasonably foreseeable that they will become willing and able to do so within a reasonable period of time.

In other words, the statutory presumption in favor of substitute parents adheres only after the family court determines that the child's natural and legal parents are incapable of providing a "safe and secure" home. Thus, the presumption does not pit a child's natural or legal parents against substitute parents at the very commencement of a permanent plan hearing, as the ICA suggests, *see* ICA's opinion at 237, 20 P.3d at 670, but, rather, favors prompt and permanent placement with substitute parents and families over continued placement in a temporary foster home or state facility.

Similarly, we do not find any constitutional infirmity in the statutory requirement that the foregoing presumption "increases in importance proportionate to the youth of the child upon the date the child was first placed under foster custody by the court." HRS § 587–73(a)(3)(B). This provision embodies nothing more than a legislative determination that (1) the younger the child, the more "defenseless, exploitable, and vulnerable" he or she is and (2) the more in need of a stable and nurturing environment a young child is than an older one. *See* HRS § 587–1. Thus, the presumption simply furthers the laudable aim of providing a child, whose legal or natural parents have been deemed "unfit," an opportunity to grow up as a member of a substitute family rather than as a ward of the state.

239, 20 P.3d at 672. The ICA predicated its holding on the statutory requirement that, at periodic review hearings, "the family court is required, among other things, to '[d]etermine whether the parties have complied with, performed, and completed each and every term and condition of the service plan which was previously court ordered[.]' HRS § 587-[7]2(c)(4) [ (1993).]'" [13] ICA's opinion at 239, 20 P.3d at 672 (some brackets added and some in original) (emphasis omitted). Apparently, the ICA construed HRS § 587-72(c)(4) as authorizing the divestiture of parental rights in the event that a parent fails strictly to comply with a court-ordered service plan.

■ An award of permanent custody, however, does not result from a review hearing conducted under HRS § 587-72 (1993), but, rather, only from a permanent plan hearing conducted pursuant to HRS § 587-73. Granted, at a permanent plan hearing, the family court may consider a parent's history of compliance or noncompliance with prior court-ordered service plans, such history being relevant to and probative of the parent's capacity to provide a safe family home with the assistance of a service plan and the reasonable foreseeability that, with the assistance of a service plan, the parent will become willing and able to provide a safe family home within a reasonable period of time, see HRS §§ 587-73(a)(1) and (2). Nevertheless, nothing in the CPA authorizes an award of permanent custody solely on the basis of a finding that a parent has not strictly complied with the terms and conditions of a service plan.

B. *The Family Court Committed No Abuse Of Discretion, Its FOFs And COLs Not Being Clearly Erroneous.*

The ICA's opinion held that the record lacked "clear and convincing evidence that Mother was unwilling or unable to provide Jane with a safe family home and was thus unfit to retain her parental rights in Jane." [14] ICA's opinion at 239, 20 P.3d at 672.

■ The family court's FOFs, as well as its determinations pursuant to HRS § 587-73(a), are reviewed under the "clearly erroneous" standard, *see supra* section II.C. Thus, the question on appeal is whether the record contains "substantial evidence" supporting the family court's determinations, and appellate review is thereby limited to assessing whether those determinations are supported by "credible evidence of sufficient quality and probative value." *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (citation omitted). In this regard, the testimony of a single witness, if found by the trier of fact to have been credible, will suffice. *Cf. State v. East-*

13. HRS § 587-72 has been subsequently amended; however, the amendments do not affect our analysis herein.

14. The entirety of the ICA's substantive analysis with respect to the foregoing holding was as follows:

In divesting Mother's parental rights in Jane, the family court entered findings relative to Mother that focused on Mother's: (1) personality and background, (2) parenting skills and style, (3) failure to strictly comply with all the terms of her service plans over the years, (4) failure to be protective of Jane, (5) failure to be "open and forthright with the various service providers in this case," and (6) failure to show progress and internalize the concepts she has learned in the services she was ordered to attend over the years.

In reviewing the record on appeal, we note that none of the social workers, outreach workers, therapists, or nurses who had directly worked with Mother ever claimed that Mother had abused, harmed, or neglected Jane. They all agreed that Mother was a loving, kind, and caring person who was deeply devoted to and bonded with Jane. Additionally, they concurred that Mother was able to provide for Jane's physical needs and was able to provide a safe home for Jane.

In filing the Petition in this case, DHS claimed that Jane was subject to imminent harm by Grandfather, [Father 2], or Father, all of whom had prior sexual or physical assault histories. However, the evidence adduced below clearly showed that Grandfather died of cancer a few months after the Petition was filed, never having seen Jane. Additionally, [Father 2] had been deported to Western Samoa and was not around to endanger Jane's life or safety. Finally, Father had never lived with Mother or been alone with Jane due to DHS's concerns and the probation conditions imposed on him. Ironically, according to the evidence in the record, the only harm ever suffered by Jane occurred when she was in the care of a foster family, prompting DHS to move Jane to a new foster home.

ICA's opinion at 238-239, 20 P.3d at 671-672.

*man*, 81 Hawai'i 131, 141, 913 P.2d 57, 67 (1996) (noting that the testimony of "merely one percipient witness" may constitute substantial evidence supporting a criminal conviction) (citing *State v. Ibuos*, 75 Haw. 118, 123, 857 P.2d 576, 578–79 (1993)); *see also Kailiunu (W.) and Lea (W.) v. Lumai (K.) and Kauwe (K.)*, 8 Haw. 256 (1891) (holding that testimony of single witness, if found credible by the jury, could constitute sufficiently substantial evidence to support a verdict on the question of inheritance). Because it is not the province of the appellate court to reassess the credibility of the witnesses or the weight of the evidence, as determined by the family court, *cf. Jenkins*, 93 Hawai'i at 101, 997 P.2d at 27, the family court "is given much leeway in its examinations of the reports concerning [a child's] care, custody[,] and welfare[.]" *Doe*, 89 Hawai'i at 487, 974 P.2d at 1077 (citations omitted).

▮▮▮▮ Applying the foregoing standard and based upon the record as discussed *supra* in section I, we cannot say that the family court's award of permanent custody of Jane to the DHS was clearly erroneous. The record unquestionably contains substantial evidence supporting the family court's determination that Mother is not willing and able to provide Jane with a safe family home, even with the assistance of a service plan. Jane's foster parents, service providers, and GAL all agreed that her developmental deficits and various behavioral problems significantly improved once she was removed from Mother's custody. Jane's foster parents reported that she "regressed" after each supervised visit with Mother. Mother, in the months preceding the filing of the DHS's motion for permanent custody, had failed to take Jane to her physical therapist and to several of Jane's scheduled follow-up medical appointments. Mother was dishonest with her service providers regarding the persons—including members of Mother's household and unauthorized secondary caretakers of Jane—to whom she permitted access to Jane. Mother's progress in dealing with her own psychological problems was minimal, if not stagnant. Mother failed for three years to demonstrate that she recognized the harm that her relationships with men, who were prone to committing domestic violence and child abuse, posed to Jane.[15] While in Mother's custody, Jane's developmental deficits and behavioral problems paralleled those evinced by Mother's other children while in her custody. Mother's vacillating compliance with service plans relating to Jane, as well as her history of poor compliance with the service plans ordered in family court proceedings regarding her other children, amply supported the family court's conclusion that her inability to provide a safe family home for Jane would not improve with the assistance of a service plan. Moreover, both Suzuki and Mother's therapist, whom the family court found to be credible witnesses, expressly testified that Mother could not provide a safe family home for Jane, even with the assistance of a service plan.

▮▮▮▮ Given the foregoing substantial evidence, and because nothing in the record leaves us with the definite and firm conviction that a mistake has been made, *see Okumura*, 78 Hawai'i at 392, 894 P.2d at 89, we cannot say that the family court clearly erred in determining that, pursuant to HRS § 587–73(a)(1), Mother was not willing and able to provide Jane with a safe family home, even

---

**15.** The import of the evidence concerning Grandfather's past abuse of Mother and Daughter 1, as well as Father 1's, Father 2's, and Father's histories of abuse and domestic violence is manifestly not, as the ICA has styled it, *see supra* note 16, that Mother was deprived of her parental rights in Jane because of these men's conduct in a vacuum, but, rather, that Mother was unwilling and unable to break the cycle initiated by Grandfather and to forego relationships with abusive men. The record therefore illuminates Mother's past and probable future failure to protect her children, especially her daughters, from the abuse of the men with whom she chose to interact. The ICA's opinion would seem to require history to repeat itself before the DHS could lawfully intervene to protect Jane. Such a requirement, however, would defeat the very purpose of the CPA, which is to protect children who have been abused or neglected or who are *at risk* of being abused or neglected. *See* HRS § 587–1 (1993 & Supp.2000) ("This chapter creates within the jurisdiction of the family court a child protective act to make paramount the safety and health of children who *have been* harmed *or* are in life circumstances that *threaten* harm." (Emphases added.)).

with the assistance of a service plan.[16] Consequently, the ICA's holding that clear and convincing evidence did not support the divestiture of Mother's parental rights in Jane, pursuant to HRS § 587–73(a), was erroneous.

## IV. *CONCLUSION*

In light of the foregoing, we reverse the ICA's opinion, filed on December 22, 2000, and affirm the family court's (1) order, filed on July 30, 1998, awarding permanent custody of Jane to DHS, (2) order, filed on September 16, 1998, denying Mother's motion for reconsideration, and (3) FOFs and COLs, filed on November 10, 1998.

---

16. The ICA's opinion did not address Mother's assertion on appeal that the family court erred in determining that it was not reasonably foreseeable that she would become willing and able to provide a safe family home for Jane within a reasonable period of time, even with the assistance of a service plan. In any event, Mother's claim is without merit, inasmuch as there is substantial evidence in the record supporting the family court's determination in this regard.

In addition to the evidence summarized above, the record reflects, as discussed *supra* in section I, that the DHS had been involved with Mother for thirteen years at the time the permanent plan hearing relating to Jane was conducted. All of Mother's other children had been temporarily removed from her custody and, albeit by her agreement, were in the DHS's permanent custody or under other legal guardianships at the time the permanent plan hearing was conducted. While in Mother's home, Mother's other children had been sexually and physically abused by men from whom Mother had not only failed to protect them, but whom she had actually introduced into the family home, despite being aware of their abusive histories. Mother continued to deny that her current relationship with Father posed the same threat of abuse to Jane and the other children as had her relationships with Grandfather, Father 1, and Father 2. Mother's commitment to the services that the DHS offered to her for Jane's benefit of Jane was mercurial. Mother's prognosis for improvement in the areas of her historic dependence upon abusive men, her parenting skills, her understanding of Jane's problems, and her awareness of potential sources of harm to Jane was bleak. As noted above, the testimony of both Suzuki and Mother's therapist, whom the family court expressly found to be credible witnesses, was that it was not reasonably foreseeable that Mother would improve or that she would become willing and able to provide a safe family home for Jane at *any* time, much less within a reasonable period of time.

Similarly, Mother's assertion that she should have been provided a period of three years after DHS filed its motion for permanent custody within which to demonstrate that she could provide a safe family home, with the assistance of a service plan, is without merit. *See Doe*, 89 Hawai'i at 491–92, 974 P.2d at 1081–82 (distinguishing *In re Male Child, Born on May 27, 1983*, 8 Haw.App. 66, 793 P.2d 669 (App.), *cert. denied*, 71 Haw. 668, 833 P.2d 900 (1990), and holding that "nothing in HRS § 587–73(a)(2) or its legislative history indicates that DHS must expend three years in attempting to achieve reunification").

Finally, Mother's claim that the family court abused its discretion in denying her motion for reconsideration—which did not proffer any new evidence, authority, or argument—without a hearing lacks merit. *See Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114–15, 839 P.2d 10, 27 (1992).