**NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

NO. 28991

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

IN THE INTEREST OF RW

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S No. 06-10820)

SUMMARY DISPOSITION ORDER
(By:  Foley, Presiding Judge, Fujise and Leonard, JJ.)

Mother-Appellant (Mother) appeals the Decision Regarding Contested Permanent Plan Hearing and Order Awarding Permanent Custody filed on January 7, 2008 by the Family Court of the First Circuit (family court)[1] that terminated her parental and custodial rights over her child, RW, and awarded Petitioner-Appellee State of Hawaiʻi Department of Human Services (DHS) with permanent custody over RW.

I.  Points on Appeal

On appeal, Mother raises the following points of error: (1) insufficient clear and convincing evidence existed that Mother is unable to provide a safe home within a reasonable period of time, contesting Finding of Fact (FOF) 158; (2) DHS failed to provide Mother a reasonable opportunity to reunify by defying the court's order to return minor from Virginia, contesting FOF 197; (3) evidence supports Mother's ability to be protective, contesting FOFs 59, 116, 144, 145, 146, 148, 150, and 152-157; (4) DHS failed to provide Mother appropriate services to reunify with RW, contesting FOF 199; and (5) DHS social workers Leanna Lui (Lui) and Kathleen Reeber (Reeber) were not credible, contesting FOFs 195 and 196.

---

[1]  The Honorable Matthew J. Viola presided.

## II.   STANDARDS OF REVIEW.

### Family Court Decisions

> Generally, the family court possesses wide discretion in making its decisions and those decision[s] will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

Fisher v. Fisher, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006)

(quoting In re Doe, 95 Hawai'i 183, 189-90, 20 P.3d 616, 622-23

(2001)).

### Family Court's Findings of Fact and Conclusions of Law (COL)

> The family court's FOFs are reviewed on appeal under the "clearly erroneous" standard. A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

> On the other hand, the family court's COLs are reviewed on appeal de novo, under the right/wrong standard. COLs, consequently, are "not binding upon an appellate court and are freely reviewable for their correctness.["]

> . . . .

> Moreover, the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal.

Id.

### Credibility of Witnesses

> It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of evidence; this is the province of the trier of fact.

Id.

III. DISCUSSION.

    A.    **Substantial evidence existed that Mother is unable to provide a safe family home within a reasonable period of time.**

        1.    **Mother demonstrated a lack of protectiveness.**

Mother appears to assert that the following demonstrated her protectiveness: her attempts to obtain a divorce, her separation from father, expressed intent not to reunite with Father, and necessary and limited contact with Father. Mother also argues that Lui's action in providing messages for Mother to pass to Father conflicted with the position that the relationship with Father renders Mother non-protective.

The record reflects that Mother was more concerned with her relationship with Father than with RW's safety. Mother (1) did not file for divorce; (2) permitted Father, who stated he harmed RW, to be in the family home before RW was relocated to Virginia; (3) allowed Father to reside with her subsequent to RW's relocation; (4) was deceptive about her contacts with Father; and (5) became pregnant again with Father's child. Where no protective order was in place, where Lui was aware of the regular contact Mother maintained with Father, and where Mother expressed her willingness to provide messages to Father, Lui's providing Mother information to relay to Father does not compel a conclusion that such action justified Mother's contact with Father. Thus, substantial evidence existed that Mother lacked the ability to be protective, and although Mother argues that contrary evidence existed, weight and credibility of the evidence is "the province of the trier of fact." Fisher, 111 Hawai'i at 46, 137 P.3d at 360.

        2.    **Mother was afforded a reasonable opportunity to reunify.**

            a.    **Perpetrator of harm.**

Mother appears to assert that the following were inappropriate, confusing, and reflected bias that precluded

Mother's reasonable opportunity to reunify: (1) the DHS position that both parents were perpetrators despite the court's position that Father caused the injuries; (2) Reeber's statement that Mother "should have protected [RW]" and Lui's statement that a perpetrator is also a non-protective person; and (3) Reeber's statements that Mother should have demonstrated more concern for RW, that parents would not get RW back, and that, without a perpetrator, services would be a "shot in the dark."

(1) Although the family court adjudicated the case based on Father's admission, the following evidence existed that Mother could have perpetrated the first injury. (a) The date of the first injury could not be established; (b) Reeber's testimony reflected that they were informed by their medical people that the injury could have occurred prior to Mother's admission to the hospital; (c) Dr. Tamara Grigsby (Dr. Grigsby), who was qualified as an expert in pediatrics and child abuse and neglect, "did not believe that [Father's] story was plausible" and "did not accept it as an explanation;" (d) Dr. Brenda Wong (Dr. Wong), a stipulated expert in clinical psychology and child abuse and neglect, noted that the Multi-Discliplinary Team (MDT) did not assume that Father's explanation of the bruises as the cause of that injury; (e) as to the second injury, Father's explanation of an accidental fall with RW did not appear to be consistent with the injury according to Dr. Grigsby. Similarly, Dr. Wong testified that the MDT did not identify who caused the fractures to RW.

Additionally, where an identified perpetrator is one that DHS can identify based on the injuries and who is responsible for the care of the child, and an admitted perpetrator is one whose explanation is consistent with the injury, and where neither parent could be eliminated as a perpetrator, evidence that Father was not an identified or admitted perpetrator was presented to the family court. Dr. Wong testified that "without an identified or admitted perpetrator . . . [w]e have to assume both are perpetrators."

Social workers Lui and Reeber were qualified by stipulation as experts in child welfare services, consistent with Hawaii Revised Statutes (HRS) § 587-40(e) (2006).[2] In light of the foregoing, Reeber and Lui had a basis for their positions that Mother was also a perpetrator of the injuries, and Mother has not demonstrated that those positions precluded Mother a reasonable opportunity to reunify.

(2) Mother also has not shown that Lui's testimony that a perpetrator is one who causes harm as well as one who fails to protect a child from harm and Reeber's similar testimony that Mother should have protected RW was confusing, incorrect, or beyond the scope of their expert testimony.

(3) As to Reeber's statements, when RW sustained the second injury, that Mother should have demonstrated more concern for RW and that Mother would not get RW back, Reeber explained that services had been provided to parents before RW incurred severe injuries and that, after Mother was informed of the extent of the rib injuries, she had no reaction and indicated that DHS was "making a big mistake" and was "wrong." The family court made the following finding that was not challenged and thus is binding:[3] "[u]nder the circumstances presented [in this] case, DHS gave Mother and Father every reasonable opportunity to succeed in remedying the problems which put [RW] at substantial risk of being harmed in the family home and to reunify with [RW]". From the foregoing, it appears that the family court did not determine that Reeber's statements evidenced bias that precluded reunification, and the family court's determination of credibility cannot be disturbed. Fisher, 111 Hawai'i at 46, 137 P.3d at 360.

---

[2] HRS § 587-40(e) states: "A person employed by the department as a social worker in the area of child protective or child welfare services is qualified to testify as an expert in the area of social work and child protective or child welfare services."

[3] In re Doe, 99 Hawai'i 522, 538, 57 P.3d 447, 463 (2002).

Mother takes issue with Reeber's testimony that giving services would be a "shot in the dark[,]" because, without an identified perpetrator, triggers of the abuse may be missed, and abuse may recur. Reeber's testimony is consistent with Dr. Wong's testimony that without an admission, services are difficult because assumptions are made about triggers of harm. Where evidence existed, as discussed <u>supra</u>, that Mother was not protective, Reeber's statement also is not contrary to Dr. Wong's testimony that if there is an identified perpetrator who is not admitting, the home can be made safe with services <u>if "the protective parent is able to . . . remain protective</u>."

Hence, where the testimonies of Lui and Reeber were supported by other evidence, where credibility is the province of the family court, and where the family court found that DHS provided Mother every opportunity to reunify with RW, Mother's assertions of bias regarding the foregoing statements cannot be sustained. Furthermore, with regard to services, where subsequent services and assistance were provided to Mother as part of the plans with the goal of reunification, as discussed in further detail below, it does not appear that reunification efforts were precluded.

### b. Services.

Mother contends that (1) appropriate services were not provided for reunification and the service plans were not fair, appropriate and comprehensive; and (2) Lui's actions stopping of hands-on parenting, subjective interpretations of Mother's interactions with RW during visitation, and comments that Mother's positive interactions during services with Enhanced Healthy Start worker Torres (Torres) were "for show" reflected bias.

(1) The record reflects that a multitude of services were provided. Following RW's first injury, services included parenting education--in-home and out-of-home--and marital counseling; parenting classes; once-a-week home-based

6

support services including household safety, infant needs and behaviors, development, infant cues, daily routine, and parent coping skills; once-a-week in-home Enhanced Healthy Start Services including parenting, attachment/parental cues and developmental screens. Subsequent to RW's second injury, the modified March 14, 2006 plan included individual therapy, couples counseling, parenting instruction through the Family Advocacy Program and through Enhanced Healthy Start upon RW's return, and supervised visitation with RW. The September 27, 2006 modified service plan included individual therapy, hands-on parenting, and supervised visitation. After RW's relocation to Virginia, the August 14, 2007 plan included individual counseling until clinically discharged, parenting education, supervised webcam visits, part-time voluntary work at a preschool or church day care, and DHS appointments to write letters for RW. Mother's arguments do not demonstrate that the services were inappropriate for reunification or that the service plans were not fair, appropriate and comprehensive. Hence, FOF 199 is not clearly erroneous. It also appears that, through the services provided, DHS made reasonable efforts at reunification, and that FOF 197 is not clearly erroneous.

(2) Mother's assertion that Lui exhibited bias by stopping hand-on parenting after RW's second injury despite Dr. Wingert's recommendation, that Lui acted inappropriately by her subjective negative interpretations of visitations including RW "avoiding parents" contrary to Torres's observation, and the statement that Mother's actions in visitation observed by Torres was "for show" cannot be maintained where Lui, a stipulated expert in social work and child protective and welfare services, was qualified under HRS § 587-40(e) to render her interpretations of RW's interactions with Mother, where credibility is the province of the family court, and where the family court determined in its

unchallenged and thus binding finding[4] that DHS provided every reasonable opportunity to reunify.

c.    **Family court's order to return RW to Hawai'i.**

Mother asserts that deliberate noncompliance with the family court's order to return RW to Hawai'i denied her a reasonable opportunity to reunify.  At the conclusion of the first permanent custody hearing, when the family court denied the first motion for permanent custody, the family court was "extremely reluctant" but could see no other option but to bring RW back and ordered RW's return "in a reasonable timeframe [sic], . . . taking into account that there needs to be transition."  Guardian Ad Litem (GAL) Pollard noted down 45-60 days, apparently believing that to be a reasonable period of time.

Evidence reflects that DHS' motion for reconsideration was timely received and deemed filed, pursuant to Rule 59(e) of the Hawai'i Family Court Rules and In re Doe, 101 Hawai'i 220, 227 n.14, 65 P.3d 167, 174 n.14 (2003), within two weeks of the order denying the first motion for permanent custody, arguing, inter alia, that RW's relocation to Hawai'i and potentially back to Virginia would cause trauma.  A hearing on the motion was set for August 22, 2007.

While the motion for reconsideration was pending, Lui, on August 12, 2007, went to Mother's home to collect medical consents for the Multi-Disciplinary Team to speak to Mother's therapist that Lui had been attempting to obtain from Mother since July 27, 2007.  Lui found evidence that Father was residing in the home and later discovered that Mother was pregnant with Father's child.  Mother initially denied that Father was residing with her, but later admitted that Father was residing with her and admitted to Lui that he had been so residing since Father's release from the brig on July 20, 2007 through August 31, 2007. Mother became pregnant at the end of April or beginning of May,

---

[4]   In re Doe, 99 Hawai'i at 538, 57 P.3d at 463.

and first knew of the pregnancy on June 16, but did not disclose this information to DHS or to the court by the conclusion of the hearing on the first motion for permanent custody on July 19, 2007.

At the August 22, 2007 hearing on the motion for reconsideration, the family court denied the motion for reconsideration, but recognized that "DHS has not returned the child to Hawaii based upon new information gained after the 7/19/07 trial." The family court denied without prejudice the portion of the motion for reconsideration tantamount to a motion to stay the order for RW's return.

Two days after the August 22, 2007 hearing, the motion to stay the order that RW be returned to Hawai'i was received and thus deemed filed on August 24, 2007 and included information of Mother's deception, pregnancy, and lack of bonding with and interest in RW.

At a hearing on September 17, 2007, the family court granted the motion to stay, finding good cause. Where a stay of the order to return RW was ultimately granted in mid-September, within the time frame the GAL apparently deemed reasonable to allow for transition, and where Mother, for the period from RW's relocation on December 9, 2006 to September 17, 2007, had not initiated webcam visitations or correspondence with RW until it was specified in the August 14, 2007 service plan or made inquiries regarding RW, it does not appear that not returning RW prior to September 17, 2007, the date of the stay order, denied Mother a reasonable opportunity to reunify.

### d. Credibility of the social workers.

Several of Mother's arguments about the credibility of the social workers have been incorporated into the preceding sections. The remaining arguments on credibility appear to be (1) Reeber's statements that Mother should have known of the rib and leg fractures based on being with RW "24/7" reflect inappropriate actions contrary to reunification efforts, because Dr. Grigsby testified that a non-offending parent would not

necessarily have known of the leg and rib injuries, no service workers detected injury or pain, and Mother only saw RW for about an hour before RW went to daycare; and (2) Lui's use of the pronoun "they" when purportedly asked about Mother, and also with Lui's laughing during her testimony, presumably as bias that precluded reunification efforts. As with Mother's other contentions regarding credibility, judgments of weight and credibility of testimony are left to the family court. Fisher, 111 Hawai'i at 46, 137 P.3d at 360.

Mother also disputes the finding that "the DHS expert opinions are based on the kind of information reasonably relied on by social workers and experts in the fields of social work and child protective or welfare services." Where Reeber and Lui's opinions were supported by information such as the MDT reports and medical experts consistent with HRS 587-40(c) and (d) (2006),[5] Mother's contention is without merit, and FOF 196 is not clearly erroneous.

In summary, with respect to Mother's reasonable opportunity to reunify, evidence established Mother's inability to be protective, and FOFs 59, 116, 144, 145, 146, 148, 150, 152, 153, 154, 155, 156, 157 are not clearly erroneous. Appropriate services were provided with a goal of reunification, and FOF 199

---

[5] HRS § 587-40(c) and (d) (2006) state:

   (c) A written report pertaining to cases pending before the family court submitted by the department pursuant to subsection (a) shall be submitted to the court in its entirety, and shall include the following:

      (1) Any report, or medical or mental health consultation, generated by a child protective services multidisciplinary team or consultant in its entirety; and

      (2) All other relevant information on placement of the child.

   (d) A written report submitted under this section shall be admissible and may be relied upon to the extent of its probative value in any proceeding under this chapter; provided that the person or persons who prepared the report may be subject to direct and cross-examination as to any matter in the report, unless the person is unavailable.

is not clearly erroneous. Mother was provided a reasonable opportunity to reunify, and FOF 197 is not clearly erroneous. The credibility of the social workers is the province of the trier of fact, and where the family court made the foregoing findings consistent with testimonies of Reeber and Lui, who were qualified as experts in the field of social work and child protective or child welfare services based upon information such as the MDT reports and medical experts, FOFs 195 and 196 are not clearly erroneous.

3. **Bases for termination of Mother's parental rights.**

Mother contends that insufficient clear and convincing evidence exists of her inability to provide a safe home for RW where she completed most of the services in the last service plan of August 14, 2007 and where the divestment of her rights was based only upon Lui's finding Father at Mother's home on the Sunday visit.

Regarding completion of services of the August 14, 2007 service plan, although webcam visitation was approved prior to the August 14, 2007 plan, on January 25, 2007, Mother failed to take any action to commence webcam visits for almost eight months, until required by the August 14, 2007 service plan. Similarly, although written communication to RW, screened through DHS, was authorized in January of 2007, and Mother was informed to do so, Mother failed to follow through with those communications until it was placed in the August 14, 2007 service plan.

Mother admits that she did not complete individual therapy, but argues that Dr. Wingert did not recommend continuation of therapy. Mother contends that Lui's behavior was inappropriate in disagreeing with Dr. Wingert's not recommending individual therapy and then asserting that Mother failed to continue individual therapy with Dr. Bobbie Carlson (Dr. Carlson). On September 11, 2007 and September 25, 2007, the court ordered individual therapy with Dr. Carlson as part of the August 14, 2007 service plan, and there is no indication of

objection to individual therapy by Mother. Individual therapy "until clinically discharged" was included in the August 14, 2007 plan, just as it was in all of the previously ordered plans: March 14, 2006 modified plan; September 27, 2006 modified. No evidence exists that Mother had been clinically discharged by Dr. Carlson.

Mother also concedes that she did not complete volunteer services that were part of the August 14, 2007 service plan. The record confirms that although Mother stated she made contact with programs but could not secure such work because of liability issues, Mother never provided Lui with requested contact persons.

Even if Mother had completed all the services, evidence existed that participation in the service plan is not enough, and that a person must have gained insight, understanding, and the ability to apply concepts to daily living and to the child's emotional needs, security, and stability. Mother has "not demonstrated that RW is more important than" the relationship with Father. "[Mother] demonstrates poor ability to be protective by" placing "her relationship with [Father] above the priority and safety resolutions for the benefit of [RW], being deceitful" in "maintain[ing] a relationship with [Father]" and "becoming pregnant once again by [Father];" "allowing [Father] to resume residence with her immediately after the court hearing on 7/19/07;" and Mother's "demonstrated inability to emotionally separate from [Father]." After the July 19, 2007 hearing, Mother "did not initiate any inquiries about [RW], reunification, services, or travel plans for return of [RW]" until "DHS wrote the 8/14/07 and 8/23/07 reports to the court that outlined developments of these concerns." Lui testified that, since the first permanent custody hearing, Mother has not placed RW as a priority over her needs or those of father and at no time from the first permanent custody hearing to August 2007, did she inquire as to services or the status of RW, and DHS always had to initiate contact.

Consequently, Mother's contention that she completed most of the services in the August 14, 2007 service plan does not establish her claim of insufficient evidence that she cannot provide a safe family home.

In addition to Lui finding Father at Mother's house, which Mother asserts is the sole basis for termination of her parental rights, the family court's numerous findings included Mother's weakness in parenting; lack of protectiveness that poses a risk of harm to RW; lack of concern in inquiring about or contacting RW; and dishonesty regarding her relationship with Father and her pregnancy that culminated in the termination of Mother's parental rights.

In consideration of the foregoing, substantial evidence existed that Mother is unable to provide a safe home within a reasonable period of time, and FOF 158 is not clearly erroneous.

IV. CONCLUSION.

Therefore, it is ordered that the January 7, 2008 Decision Regarding Contested Permanent Plan Hearing and Order Awarding Permanent Custody issued by the Family Court of the First Circuit is affirmed.

DATED: Honolulu, Hawai'i, June 28, 2010.

On the briefs:

Herbert Y. Hamada,
for Mother-Appellant.

Mary Anne Magnier and
Gay M. Tanaka,
Deputy Attorneys General
for Petitioner-Appellee.

Presiding Judge

Associate Judge

Associate Judge