**Electronically Filed
Intermediate Court of Appeals
CAAP-20-0000742
20-JUL-2021
07:47 AM
Dkt. 108 SO**

NO. CAAP-20-0000742

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

IN THE INTEREST OF GL AND AL

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 17-00224)

SUMMARY DISPOSITION ORDER
(By: Leonard, Presiding Judge, Hiraoka and Nakasone, JJ.)

Appellant Mother (**Mother**) and Cross-Appellant Father (**Father**) appeal from the Order Terminating Parental Rights, filed on November 30, 2020 (**Termination Order**), in the Family Court of the First Circuit (**Family Court**).[1]  In the Termination Order, the parental rights of Mother and Father to their children, GL and AL (collectively **Children**), were terminated, and a permanent plan with the goal of adoption was approved.  On December 17, 2020, the Family Court entered Findings of Fact and Conclusions of Law (**FOFs and COLs**) regarding the Termination Order.

On appeal, Mother challenges FOFs 189-91 and 200, and COLs 15 and 16.[2]  Mother contends there was no clear and

---

[1]  The Honorable Bode A. Uale presided.

[2]  FOFs 189-91, 200, and COLs 15 and 16 stated as follows:

189.  Mother is not presently willing and able to provide the Children with a safe family home, even with the assistance of a service plan.

(continued...)

convincing evidence she was not presently willing and able to provide a safe family home, even with the assistance of a service plan, or that it was not reasonably foreseeable she would become willing and able to provide a safe family home, even with the assistance of a service plan, within a reasonable period of time not to exceed two years from the Children's date of entry into foster care. Mother also claims Petitioner-Appellee the State of Hawaiʻi, Department of Human Services (**DHS**) did not provide a reasonable opportunity for Mother to reunify with the Children because she did not receive appropriate services, timely referrals for services, or visitation with the Children despite her requests.

---

[2](...continued)
        190. It is not reasonably foreseeable that Mother will become willing and able to provide the Children with a safe family home, even with the assistance of a service plan.

        191. Under the circumstances presented by the case, Mother was given every reasonable opportunity to effect positive changes to provide a safe family home and to reunify with the Children.

        . . . .

        200. Under the circumstances presented by this case, the DHS has exerted reasonable and active efforts to reunify Father and Mother with the Children by identifying necessary, appropriate and reasonable services to address the identified safety issues/problems, and by making appropriate and timely referrals for these services. Any delays in the delivery of services were due to Father's and Mother's conduct.

        . . . .

        15. The Children's legal mother, legal father, adjudicated, presumed, or concerned natural father, as defined under HRS Chapter 578, are not presently willing and able to provide the Children with a safe family home, even with the assistance of a service plan.

        16. It is not reasonably foreseeable that the Children's legal mother, legal father, adjudicated, presumed, or concerned natural father, as defined under HRS Chapter 578, will become willing and able to provide the Children with a safe family home, even with the assistance of a service plan, within a reasonable period of time.

On cross-appeal, Father challenges FOFs 172-74, 192-96, 199, 200, 202, and 203.[3] Father contends there was no clear and

_____

[3] FOF 200 is quoted supra. FOFs 172-174, 192-96, and 199, 202, and 203 stated as follows:

172. Under the circumstances presented by this case, Father was given every reasonable opportunity to effect positive changes to provide a safe family home and to reunify with the Children.

173. Father is not presently willing and able to provide the Children with a safe family home, even with the assistance of a service plan.

174. It is not reasonably foreseeable that Father will become willing and able to provide the Children with a safe family home, even with the assistance of a service plan. Even if Father were to suddenly change his long standing pattern of behavior, there is no likelihood that he would sufficiently resolve his problems at any identifiable point in the future.

. . . .

192. Having made the HRS § 587A-33(a)(1) and (2) "parental unfitness" findings of fact, the court makes the following findings of fact regarding the Permanent Plan, dated February 25, 2020, pursuant to HRS § 587 A-33(a)(3).

193. The permanency goal of the February 25, 2020 Permanent Plan is adoption.

194. Any argument that the Children's desire to have contacts with Father, [AL]'s desire to have contacts with Mother, and the resource caregiver's position to allow such visits if deemed therapeutically appropriate by the Children's therapist and the visits are in the Children's best interest is/are compelling reasons why the permanent plan goal should be legal guardianship instead of adoption as being in the Children's best interests is not credible based on the credible evidence in the record and drawing all reasonable inferences in the record. A legal guardianship order with visitation provisions would only serve the interests of Father and Mother, and not the Children's best interests. Adoption would provide the adoptive parents the ability to fully address all of the Children's physical and emotional needs. More importantly, adoption would provide the Children with a safe, permanent and lifetime home, in accordance with the HRS § 587A-32(a) presumption that adoption is in the Children's best interests.

195. There are no compelling reasons why the goals of either legal guardianship or permanent custody is in the Children's best interests. Therefore, the goal of adoption is in the Children's best interests.

196. The Permanent Plan, dated February 25, 2020, with the permanency goal of adoption, is in the Children's best interests.

(continued...)

3

convincing evidence he could not presently provide a safe family home, even with the assistance of a service plan, or it was not reasonably foreseeable he would become willing and able to provide a safe family home, even with the assistance of a service plan, within a reasonable period of time; that he was not given a reasonable opportunity to reunite with the children; that the DHS failed to identify the necessary, appropriate, and reasonable services to address the safety issues and failed to make appropriate and timely referrals for services; that the service plan offered by the DHS was not fair, appropriate, and comprehensive; that the permanent plan was not in the best interest of the children; and that due to the failure to provide timely referrals for services, there was a compelling reason for the DHS to not file a motion to terminate parental rights. Father also claims he was not provided reasonable visitation when it was stopped from October 2018 to October 2020, and the DHS failed to provide recommended services from Father's psychological evaluation, such as in-home parenting or parent-child attuned therapy, or to provide recommended services stemming from paternal grandmother's psychological evaluation.

---

[3](...continued)

. . . .

> 199. Each of the service plans offered by the DHS and ordered by the court were fair, appropriate, and comprehensive.

. . . .

> 202. There were no compelling reason [sic] for the DHS not to file its motion to terminate parental rights.

> 203. The exceptions to the requirement that the DHS file its motion to terminate parental rights if either the Children were in the continuous foster care of the DHS for twelve consecutive months or an aggregate of fifteen out of the most recent twenty-months from the Children's November 16, 2017 Date of Entry Into Foster Care under HRS §§ 587A-30 (c) and 587A-31(g) are not applicable based on the credible evidence in the record. As noted above, the Children were in the continuous foster care of the DHS for approximately twenty-two months from the Children's November 16, 2017 Date of Entry Into Foster Care when the DHS filed its Motion to Terminate Parental Rights in February 2020, and therefore the DHS exceeded the statutory deadline to file its motion.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Mother's and Father's points of error as follows, and affirm.

Hawaii Revised Statutes (**HRS**) § 587A-33(a) (2018) governs the termination of parental rights and provides in relevant part, as follows:

> (a)  At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:
>
> > (1)  A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child with a safe family home, even with the assistance of a service plan;
> >
> > (2)  It is not reasonably foreseeable that the child's parent whose rights are subject to termination will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care; [and]
> >
> > (3)  The proposed permanent plan is in the best interests of the child.

"Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." In re Doe, 95 Hawaiʻi 183, 189, 20 P.3d 616, 622 (2001) (internal quotation marks and citations omitted).

> The family court's determinations . . . with respect to (1) whether a child's parent is willing and able to provide a safe family home for the child and (2) whether it is reasonably foreseeable that a child's parent will become willing and able to provide a safe family home within a reasonable period of time present mixed questions of law and fact; thus, inasmuch as the family court's determinations in this regard are dependant upon the facts and circumstances of each case, they are reviewed on appeal under the clearly erroneous standard.  Likewise, the family court's determination of what is or is not in a child's best interests is reviewed on appeal for clear error.
>
> Moreover, the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in

> this regard, if supported by the record and not
> clearly erroneous, must stand on appeal.

Id. at 190, 20 P.3d at 623 (citations, quotation marks, and
brackets omitted).

> The family court's FOFs are reviewed on appeal
> under the clearly erroneous standard.  A FOF is
> clearly erroneous when (1) the record lacks
> substantial evidence to support the finding, or (2)
> despite substantial evidence in support of the
> finding, the appellate court is nonetheless left with
> a definite and firm conviction that a mistake has been
> made.  Substantial evidence is credible evidence which
> is of sufficient quality and probative value to enable
> a person of reasonable caution to support a
> conclusion.
>
> On the other hand, the family court's COLs are
> reviewed on appeal de novo, under the right/wrong
> standard.  COLs, consequently, are not binding upon an
> appellate court and are freely reviewable for their
> correctness.

Id. (citations, brackets, quotation marks, and ellipsis omitted).
"It is well-settled that an appellate court will not pass upon
issues dependent upon the credibility of witnesses and the weight
of evidence; this is the province of the trier of fact."  Id.
(citations, brackets, and internal quotation marks omitted).
Unchallenged findings of fact are binding on appeal.  In re Doe,
99 Hawai'i 522, 538, 57 P.3d 447, 463 (2002).

The pertinent facts in common to both Mother's and
Father's appeals are as follows.  The DHS confirmed the October
9, 2017 report of physical neglect, threat of abuse and threat of
neglect of the Children by Mother and Father because the then-
six-year-old twin Children were left alone in the family home
without adult supervision; they were exposed to the violent
incidents between Mother and Father, and illicit drug use by
Mother; and there were concerns about the physical condition of
the home.  See FOFs 7, 8.  The DHS assumed temporary foster
custody, and the Children were in the first foster care home from
October 9, 2017 to March 19, 2018.  See FOFs 9, 98.

When they were first placed in the foster care home,
the Children were undisciplined, lacked any personal hygiene
skills, and were doing poorly academically, which the Family
Court found were the result of the neglect by Mother and Father,

and the failure of Mother and Father to provide structure to the Children.  See FOFs 98, 113-15.  The Children also engaged in highly sexualized behavior, including but not limited to excessive masturbation, had frequent nightmares and wet their beds while they slept.  FOF 116.  The DHS removed the Children from their first resource care home on March 19, 2018 at the request of the resource caregiver because she found the Children's behaviors too difficult to handle.  FOF 98.  The Children were then placed with a teacher for one of the Children who became a licensed resource caregiver; the Children have continuously resided at this home.  FOF 99.

In July 2018, the Children started therapy to address the above-described behaviors.  FOF 117.  During the course of therapy, the Children disclosed that:  GL was sexually abused by friends and/or associates of Mother, and that AL witnessed the sexual abuse of GL; and GL was sexually abused by the Children's adult paternal half-brother and that AL witnessed the sexual abuse of GL.  See FOFs 81, 82.  The Family Court found that the Children's allegations were credible, and that both were traumatized by these experiences.  FOF 83.  GL also credibly disclosed that Mother would leave the family home with AL, leaving GL alone in the home for extended periods of time without adequate supervision, and GL was left to care and feed herself, provided that there was food in the family home.  FOF 84.

The Children suffered from Post-Traumatic Stress Disorder, nightmares, bed-wetting, and dissociative behaviors "from the harm perpetrated by Father and Mother."  FOF 86.  The Family Court found that the Children suffered psychological harm from Father and Mother.  FOF 87.

After two years in therapy, the Family Court found that the Children "made tremendous gains behaviorally, emotionally and academically in the absence of any contact from Father and Mother."  FOF 125.  The undisciplined behavior, the bedwetting and sexualized behaviors stopped, and the Children were in the top five percent of their school class.  Id.  Even though the Children had made tremendous strides in therapy and achieved a

certain degree of emotional and behavioral stability, "any direct and indirect contact with Father and Mother" would "endanger the Children's emotional health and well-being, and negate all therapeutic gains." FOF 124. At the time of the start of trial on October 29, 2020, the Children's therapist testified that due to the Children's progress, they were ready to have contact with Father. FOF 127. Both Children were concerned about Father's health[4] and expressed the desire to have contact with him. FOF 110. However, the Children did not want to live with Father because they believed that Father could not protect them from the "bad people" who sexually abused GL, and that Father could not play with them due to his health. Id.

The trial on the DHS's March 11, 2020 Motion to Terminate Parental Rights was held on October 29, 2020 and November 16 and 18, 2020. FOFs 65, 67. On November 25, 2020, the Family Court entered its Amended Decision and Order, which contained the HRS § 587A-33(a) findings by clear and convincing evidence, and orders granting the DHS's motion, terminating Mother's and Father's parental rights, and awarding permanent custody to the DHS. FOF 68. On November 30, 2020, the Family Court entered the Order Terminating Parental Rights, awarding permanent custody to the DHS, and ordering the February 24, 2020 Permanent Plan, with the goal of adoption. FOF 69.

Mother

There was clear and convincing evidence to support FOFs 189, 190, COLs 15 and 16, that: Mother was not presently willing and able to provide a safe family home, even with the assistance of a service plan; and that it was not reasonably foreseeable Mother would become willing and able to provide a safe family home, even with the assistance of a service plan, within a reasonable period of time not to exceed two years from the date the children entered foster care on November 16, 2017.

---

[4] Father suffers from a kidney condition that required him to be away from the family home for significant periods of time to undergo dialysis treatment. FOF 133.

See FOFs 16, 95. Mother was absent for the first year of this case, when she defaulted for failing to appear on November 16, 2017 until she appeared on November 14, 2018. See FOF 177. During this one-year period, Mother did not maintain contact with the DHS, and finally appeared at court after she was incarcerated. Id. The Family Court found "Mother's lack of progress in addressing her problems during this approximately one-year period [wa]s due solely to Mother's failure to engage with the court and the DHS." Id. On January 10, 2019, Mother was ordered to follow the November 1, 2018 service plan, which required Mother to participate in, *inter alia*, a psychological evaluation, parenting classes, and domestic violence intervention. See FOF 35. "Mother failed to appear for psychological evaluations scheduled for February 2018, July 2019, and twice in February 2020." FOF 178. The evaluation was finally done over two years later, in June 2, 2020. Id. The evaluation resulted in 13 recommendations for services to Mother, including individual therapy, parenting education classes and domestic violence counseling. See FOF 183. After Mother participated in two parenting classes, the classes were suspended due to the pandemic, and Mother had to be re-referred for parenting classes. See FOF 185.

The Family Court found "Mother's defensiveness and/or minimization of her problems, and lack of insight into her role in causing the harm (and resulting trauma) to the Children [were] tremendous barriers" to Mother making the positive lifestyle changes necessary to reunify with the Children. FOFs 182, 184. The record reflects that Mother had unaddressed issues which demonstrated she was not presently willing and able to provide a safe family home, even with the assistance of a service plan. Thus, the Family Court's finding and determination in this regard, in FOF 189 and COL 15, were supported by substantial evidence and not clearly erroneous. See Doe, 95 Hawaiʻi at 190, 20 P.3d at 623.

When the hearing on the Motion to Terminate Parental Rights concluded on November 18, 2020, the Children had been in

foster care for over three years. Thus, the reasonable period of time of two years had already been exceeded. See HRS § 587A-33(a)(2). The Family Court found that "Mother cannot be reunified with the Children at any reasonably foreseeable point in the future," due to the "severity of the Children's mental health problems arising out of the trauma caused by the magnitude of the abuse perpetrated on them, the extent of Mother's problems, Mother's lack of insight into her problems and her role in causing the harm to the [C]hildren, and Mother's delays in participating in services." FOF 187. Thus, the Family Court's finding and determination, in FOF 190 and COL 16, that it was not reasonably foreseeable Mother would become willing and able to provide a safe family home, were supported by substantial evidence and not clearly erroneous. See Doe, 95 Hawaiʻi at 190, 20 P.3d at 623.

Mother also claims the DHS did not make a reasonable effort to reunify her with the children and argues the following timeline: she voiced her desire to voluntarily comply with services on October 16, 2017; she requested referral for services and visits on April 30, 2019; there were still no referrals or visits by May 16, 2019; Mother raised the issue of no referrals, late referrals, or being placed on a waiting list on June 27, 2019; Mother again noted the lack of referrals for services on October 15, 2019; and she contested a reasonable efforts finding on June 22, 2020. Mother also complains that she was not referred to non-offender sex abuse treatment like Father; was not provided a therapist of Samoan descent or someone fluent in the Samoan language and sensitive to her cultural background as recommended by a psychological evaluation; was "never" given visits by the DHS even though one of the Children was open to visits with Mother; and the Children's therapist was not informed of Mother's compliance but only her non-compliance; and the Children's therapist stated there would be a benefit to informing the Children of a parent's compliance in services. Mother's arguments are without merit.

"The child protective services under [HRS Chapter 587A] shall be provided with every reasonable effort to be open, accessible, and communicative to the persons affected by a child protective proceeding without endangering the safety and best interests of the child under this chapter."  HRS § 587A-2 (2018).  "DHS is under an obligation to provide a reasonable opportunity to parents through a service plan to reunify the family" and "an obligation to make reasonable efforts to reunite parent and child."  In re Doe, 100 Hawaiʻi 335, 343, 60 P.3d 285, 293 (2002) (interpreting HRS Chapter 587, the predecessor to HRS Chapter 587A).

Although Mother stated she desired to voluntarily participate in services in October 2017 when the case began, Mother was "absent from this case" soon thereafter on November 16, 2017 for a one-year period when she was incarcerated.  FOF 177.  Mother failed to participate timely in a psychological evaluation, which took two years to complete because she did not show up.  See FOF 178.  Even after Mother reappeared in the case in November 2018, Mother did not follow up with the DHS referrals for parenting education, and domestic violence intervention in a timely and consistent manner.  See FOF 185.  At the time of trial, the DHS was waiting for Mother to complete individual therapy before re-referring her for other services because the DHS did not want to overwhelm Mother with services due to her low cognitive functioning.  See id.

In 2019 there was also a brief period where a temporary protective order was in place, prohibiting Mother and Father from having any contact with the Children, from May 16, 2019 to June 7, 2019, due to Father's and Mother's May 10, 2019 unauthorized contact with the Children.  FOFs 40, 41.  Father and Mother had gone to the Children's school for the Children's school field trip, with Mother going into the school to look for the Children to see Father.  FOF 146.  Father and Mother followed the school bus in an attempt to go on the field trip with the Children, which they had no permission to do.  Id.  This unauthorized

contact caused negative effects and regressive behaviors in the Children. FOF 40.

In light of the record noted above, Mother's complaint that a lack of referrals and visits by the DHS in 2019 demonstrated the DHS's lack of reasonable efforts at reunification, is without merit. The record contains substantial evidence that Mother "was given every reasonable opportunity" to make the changes necessary to reunify with the Children; and thus, FOF 191 was not clearly erroneous. See Doe, 95 Hawai'i at 190, 20 P.3d at 623. The record shows that the DHS exerted reasonable and active efforts toward reunification through making appropriate and timely referrals for the necessary, appropriate and reasonable services, and that "[a]ny delays in the delivery of services were due to . . . Mother's conduct;" thus, FOF 200 was not clearly erroneous. See id.

We briefly address Mother's remaining arguments as follows. Non-offender sex abuse treatment was not recommended for Mother. The recommendation that Mother's therapist be of Samoan descent or be fluent in Samoan was not made until she completed her psychological evaluation in 2020. See FOFs 178, 183. The Family Court found that "language was not a barrier" in Mother's counseling participation. FOF 186. Finally, Mother's claim that she was never provided with visits is without merit. When Mother re-appeared in the case in November 2018, the Family Court was addressing the Children's 2018 disclosures of sexual abuse by "Mother's friends and/or associates" and by their adult half-brother. FOFs 28, 30, 81, 82. The Family Court found that "any direct and indirect contact with Father and Mother before the Children had adequately and appropriately addressed the trauma" they had suffered while in the care of Mother and Father "would endanger the Children's emotional health and well-being . . . ." FOF 124. Any contact with Mother and Father was subject to the Children's therapist's recommendation. Id. The Children's therapist did not recommend visits with Mother by the time her parental rights were terminated on November 30, 2020,

even though one of the children indicated a willingness to visit with Mother. See FOFs 111-12.

For all of the reasons supra, we affirm the Termination Order as to Mother.

Father

Father first contends that FOFs 173 and 174, that Father was not presently willing and able to provide a safe family home, and that it was not reasonably foreseeable that Father would become willing and able to provide a safe family home, even with the assistance of a service plan, were not supported by clear and convincing evidence. This contention is without merit.

The record reflects substantial evidence of Father's inability to provide a safe family home, even with a service plan, both presently and within a reasonable period of time not to exceed two years from November 16, 2017. The Family Court found that Father was away from the family home for significant periods of time due to his dialysis treatment, and Father would leave the Children either unsupervised or with inappropriate caregivers while undergoing dialysis. FOF 133. Father's health raised concerns about his ability to physically meet the demands of caring for and supervising the Children. FOF 134. Prior to the suspension of his visits in October 2018, Father stayed in his van while the Children were at the playground, instead of interacting with and supervising the Children. Id. Even when Father was home with the Children, Father had relied on others, such as his adult son (the Children's adult half-brother who sexually abused GL) to care for the Children. FOF 135. Father had also relied on Mother to care for the Children, even though he was home and knew that Mother was unable to safely care for the Children. Id.

The Family Court found that Father did not have appropriate and healthy views about parent-child roles, and believed that the Children, even at their young age, were responsible to care for the adult, instead of the adult being responsible to care for the child. FOF 136. Father saw the

Children "as objects for adult gratification" and placed "his need before the needs of the Children." Id. Father had "no insight into the physical and emotional needs of the Children and the trauma suffered" by them. FOF 137.

Contrary to Father's claim that "Father completed his services and only needed visitation to be able to start so he could have a chance at reunification," the Family Court found that "it is possible for the parents to participate in and complete services and yet fail to make appropriate lifestyle changes necessary for the parents to be able to provide a safe family home for their children." FOF 73. "Unless parents are sincerely motivated to make such lifestyle changes, are honest and truthful in services regarding their problems, and gain insight into all of their behaviors that led to their children to be harmed and/or subject to threatened harm, the parents will not be able to make the necessary and appropriate internal changes to allow them to provide a safe family home for their children." Id. While Father completed parenting education, and engaged in individual therapy to address his anxiety, depression, and domestic violence issues, the Family Court was not convinced that Father had acknowledged his son's sexual abuse of GL, or acknowledged all of the trauma suffered by the Children, and the effects of such trauma. See FOFs 148, 163-64. The Family Court did not believe Father's promise to apply all the skills he learned in these services he had received. See FOFs 165, 210. Even though Father had "just completed" the required "non-offender sexual abuse education/therapy" by the time of trial, the therapist could not determine whether Father "benefitted and integrated the concepts that were taught to him in non-offender sexual abuse education/therapy." FOFs 165, 167. Further, Father had delayed in completing this service plan requirement due to Father's delay in contacting the provider, and later failing to participate in the services in a timely manner. See FOF 165.

Ultimately, the Family Court determined in unchallenged FOF 168 that, even after Father's completion of the services, Father would "continue to pose a substantial foreseeable threat

of harm" to the Children and that Father would "not be willing and able to provide a safe home for the Children."  The Court found that at the time of trial, Father "continues to place his needs for self-gratification over the enormous physical and mental health needs of the Children" and that Father "has no insight into the magnitude of the harm and the resultant severe trauma suffered by the Children."  Id.  In light of the record described supra, FOFs 173 and 174, regarding the Family Court's determinations of Father's present and potential ability to provide a safe family home, were supported by substantial evidence and not clearly erroneous.  See Doe, 95 Hawaiʻi at 190, 20 P.3d at 623.

Father next challenges FOFs 172, 199, and 200, contending that he was "not given a reasonable opportunity to reunite" with the Children before his parental rights were terminated, because the DHS:  failed to provide reasonable visitation between October 2018 to October 2020; failed to provide in-home parenting or parent-child attuned therapy as recommended by Father's psychological evaluation and instead provided the resource caregiver with parenting services; and the DHS failed to provide services recommended for paternal grandmother in her psychological evaluation.  These contentions are without merit.

The Family Court found that Father's failure to reunify with the Children within a reasonable period of time within two years of November 16, 2017, was "due to his own conduct, by placing his needs over the needs of the Children."  FOF 169. The Family Court heard and rejected Father's complaint "that the DHS did not make timely referrals for services for him," finding Father's claim "not credible."  FOF 170.

> Under the circumstances, the DHS made timely referrals for services, and any delay in the completion of services was the result of Father's conduct.  More importantly, the ability to provide timely services, such as family therapy, was heavily impacted by the Children's mental health condition and needs which was caused by the trauma they suffered while in Father's care.

Id.

Contrary to Father's assertion, the record reflects that Father was afforded reasonable visitation under the circumstances, between October 2018 to October 2020.  Prior to the suspension of visitation in 2018, the Family Court found that Father had "no insight into the physical and emotional needs of the Children and the trauma suffered by the Children, which was caused by his inappropriate care of the Children, and the severe effects of the trauma."  FOF 137.  At the September 26, 2018 visit, Father told the visitation supervisor that he was cancelling the next visit scheduled for September 29, 2018 to "discipline the Children because the Children were not obeying him during the visit."  FOF 138.  During supervised visits, Father also continuously violated the DHS's and the visitation supervisor's instructions not to discuss the Child Protective Act case with the Children, and Father repeatedly told the Children not to talk to the DHS social worker and their Guardian ad Litem (**GAL**).  FOF 139.  Generally during visits, the Family Court found that Father would remain in his van while the Children played at the playground, Father would not interact with the Children while they played, and at times, Father would fall asleep in his van while the Children were at the playground.  FOF 140.

The visits with Father were suspended in October 2018, in consultation with the GAL and the Children's therapist, because the Children displayed "regressive negative behavior" such as "bedwetting and nightmares" whenever Father had "direct and indirect contact with the Children" and due to Father's failure to follow the DHS's instructions to not discuss this case with the Children.  FOFs 27, 123, 141.  The Family Court determined that "any direct and indirect contact with Father and Mother before the Children had adequately and appropriately addressed the trauma caused while in the care of Mother and Father would endanger the Children's emotional health and well-being, and negate all therapeutic gains."  FOF 124.

In November 2018, a month after Father's visits were suspended, the Children disclosed additional sexual abuse against GL by their adult half-brother, which AL had witnessed.  FOFs 82,

83, 154. Father's visits continued to be suspended for the additional reason that he "did not believe that his son sexually abused [GL]." FOFs 29, 30, 155.

During the suspension of visitation period, Father continued to violate the court orders and the DHS's instruction not to contact the Children. See FOF 142. Father would violate the no-contact order and the DHS's instruction, by asking other children in his building to pass notes to the Children at school and relaying oral messages to them through the neighborhood children, FOF 144; driving by the Children's school to attempt to physically contact them, FOF 145; appearing at the school in May 2019 with Mother who removed the Children from a cafeteria to talk with Mother and Father, then following a bus taking the Children on a school field trip, FOF 146, noted supra. The Family Court found that "Father's willful violation of the DHS'[s] instructions and the Court's orders not to have direct and indirect contact with the Children shows Father's propensity to place his needs over the needs of the Children without any regard to any negative consequences of his conduct on the Children." FOF 147. In November 2019, the Family Court found that both parents had made "minimal progress in addressing" their problems, and that DHS was making reasonable efforts to "finalize the concurrent permanency goals of reunification and adoption[.]" FOF 50. Father still had to complete his services, and the Family Court determined that Father could not have contact with the Children until the DHS, the GAL, and the therapist agreed that such contact was "therapeutically appropriate for the Children[.]" FOF 53. The therapist did not feel that the Children were therapeutically ready for visits with Father, until the end of 2020. "On October 29, 2020, [the therapist] testified credibly that the Children may be ready to have contact with Father. As a result, the Court authorized the DHS to arrange a visit between the Children and Father." FOF 127. Pursuant to the Court's October 29, 2020 order, the Children and Father had a "virtual visit" where the therapist conducted a family therapy session. FOF 128. The Children did not appear to have been

traumatized by this visit.  Id.  Thus, the record shows that Father was afforded reasonable visitation under the circumstances.

Father's remaining arguments about the services provided, or not provided by the DHS, have no merit.  The Family Court rejected these same claims at trial, finding that "Father's testimony and representations that the DHS did not make timely referrals for services for him" were "not credible" and "not supported by the credible evidence."  FOF 170.  Father's complaint that the parent-child therapy was afforded to the resource caregiver and not Father, was because the therapy was immediately necessary due to the severity of the Children's trauma-related behaviors; and to have the Children engage in such therapy with Father when they were not ready, risked further emotional harm to the Children.  See FOF 130.  The Family Court found that "[a]t no time during the three-year pendency" of this case were the Children ready to have such therapy with Father. FOF 130.

Finally, Father's claim that the DHS failed to provide services stemming from paternal grandmother's psychological evaluation is inapposite.  "[Grandmother's] evaluation raised concerns" about her "low cognitive functioning, and her minimization of the concerns about Father's parenting and the sexual abuse allegations[,]" and there were also concerns about grandmother's visa.  FOF 160.  The DHS also had concerns that grandmother "would defer all decisions to Father because culturally she had to defer all decisions [sic] Father who was the head of the household."  FOF 161.  However, the DHS was not ordered to provide recommended services.  The grandmother later returned to Australia.  FOF 162.

In sum, the record reflects substantial evidence of the DHS's reasonable, active efforts at reunification, and provision of services to Father that were reasonable, fair, appropriate, and timely under the circumstances.  Thus, FOFs 172, 199, and 200 were not clearly erroneous.  See Doe, 95 Hawaiʻi at 190, 20 P.3d at 623.

Regarding Father's challenge to FOFs 202 and 203, Father claims that there were compelling reasons for the DHS not to file its motion to terminate because the DHS did not make reasonable efforts to reunify Father and did not provide him the reasonable opportunity to reunify with the Children. The identical language of HRS §§ 587A-30(c)(2) (2018) and 587A-31(g)(2) (2018)[5] required the DHS to file a motion to terminate parental rights if the Children had been in foster care for an aggregate 15 out of the most recent 22 months from November 16, 2017 unless, *inter alia*, the DHS did not provide timely services to Father to effectuate reunification. Here, the Family Court found that the DHS made appropriate and timely referrals for Father's services, treated Father fairly, and "intensely" serviced the entire family. FOFs 200, 201. The record in totality reflects substantial evidence to support the Family Court's determination that there was no compelling reason and no exception that applied, for the DHS not to file a motion to terminate; and thus, FOFs 202 and 203 were not clearly erroneous. See Doe, 95 Hawaiʻi at 190, 20 P.3d at 623.

Father next challenges FOFs 192-96, and claims that "[t]erminating Father's rights and supporting a permanent plan for adoption under these findings and conclusions is not in the children's' best interest." Father argues that even though maintenance of family connections was in every permanent plan, the resource caregiver was a non-relative, and the DHS did not make reasonable efforts to place the Children with any relatives, including the grandmother. Maintenance of family connections is a relevant factor of the permanent plan and subject to the

_____

[5] The language in HRS §§ 587A-30(c)(2) and 587A-31(g)(2) provides, as follows:

> (2) The department has not provided to the family of the child, consistent with the time period required in the service plan, such services as the department deems necessary for the safe return of the child to the family home.

child's best interest standard. HRS § 587A-32(a)(4)[6] (2018) and HRS § 587A-33(a)(3).

Here, the Family Court considered the issue of maintaining family connections, and rejected legal guardianship, based on the "credible evidence in the record." FOF 194. The Family Court found that adoption would "provide the adoptive parents the ability to fully address all of the Children's physical and emotional needs." Id. More importantly, the Family Court found that adoption would provide the Children "with a safe, permanent and lifetime home, in accordance with the HRS § 587A-32(a) presumption that adoption is in the Children's best interests." Id. The Family Court did find that the resource caregiver "expressed the desire and the willingness to adopt the Children," and he would allow the Children "to visit with Father and/or Mother, as long as the visits/contacts are approved by the Children's therapist and are in the Children's best interests." FOF 106. "[The] DHS did explore relatives proposed by Father and/or Mother, but the DHS assessed that placement with these relatives would not be in the Children's best interests." FOF 107. The Family Court retains wide discretion in Child Protective Act cases. See Doe, 95 Hawaiʻi at 189, 20 P.3d at 622. There was substantial evidence in the record supporting the Family Court's support of the permanent plan for adoption and thus, FOFs 192-96 were not clearly erroneous. See id. at 190, 20 P.3d at 623. We will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence, as this is the province of the trier of fact, the Family Court in this case. Id.

For all of the reasons supra, we also affirm the Termination Order as to Father.

---

[6] With regard to the permanent plan, HRS § 587A-32(a)(4) states in relevant part:

(4) Establish other related goals, including those pertaining to the stability of the child's placement; education; health; therapy; counseling; relationship with the child's birth family, including visits, if any; cultural connections; and preparation for independent living[.]

Therefore, IT IS HEREBY ORDERED that the Order Terminating Parental Rights, filed on November 30, 2020, in the Family Court of the First Circuit, is affirmed.

DATED: Honolulu, Hawaiʻi, July 20, 2021.

On the briefs:

Tae Chin Kim
for Mother-Appellant

Crystal M. Asano
for Father-Cross-Appellant

Patrick A. Pascual
Julio C. Herrera
Deputy Attorneys General
for Petitioner-Appellee/Cross-Appellee

/s/ Katherine G. Leonard
Presiding Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Karen T. Nakasone
Associate Judge