**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-21-0000350**
**27-JUN-2022**
**07:52 AM**
**Dkt. 104 SO**

NO. CAAP-21-0000350


IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


IN THE INTEREST OF K CHILDREN,
KK1, KK2, and KK3


APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 16-00196)


SUMMARY DISPOSITION ORDER
(By:  Ginoza, Chief Judge, Nakasone and McCullen, JJ.)

Appellant-Father (**Father**) appeals from the Decision and Order Re: Motion to Terminate Parental Rights, filed on April 30, 2021, by the Family Court of the First Circuit (**Family Court**).[1] In his appeal, Father challenges many findings of fact (**FOFs**) and conclusions of law (**COLs**) in the Family Court's Findings of Fact and Conclusions of Law, filed on June 24, 2021.  He further contends the record lacks clear and convincing evidence supporting the Family Court's conclusions that: Father is not willing and able to provide his three children (**Children**)[2] a safe family home and would not become willing and able to do so within a reasonable period of time; and that Petitioner-Appellee State of Hawaiʻi, Department of Human Services' (**DHS**) February 13, 2020

---

[1]  The Honorable Jessi L.K. Hall presided.

[2]  When trial started, on October 7, 2020, the Children were thirteen (13), eight (8), and five (5) years old, respectively.

permanent plan (**Permanent Plan**) is in the Children's best interests.  Father also asserts the Family Court abused its discretion and/or committed structural error by denying his choice of private counsel and by denying his request for a continuance of trial, which prevented him from pursuing reunification through joint therapy and from being represented by counsel of choice.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Father's points of error as follows and we affirm.[3]

**(1)** Father contends the Family Court abused its discretion and/or committed structural error in denying his request for a further continuance of trial (which had previously begun) to allow private attorney Andrea Graf (**Graf**) to represent him at the continued trial in April 2021, pro bono, in place of court-appointed counsel, Jacob Delaplane (**Delaplane**), or alternatively, to be represented by both counsel "at no additional cost" to the Family Court and without a continuance. Father contends a criminal defendant's right to counsel under the Sixth Amendment to the United States Constitution and article I, section 14 of the Hawaiʻi Constitution "encompasses a right to privately retained counsel of choice," State v. Maddagan, 95 Hawaiʻi 177, 179-80, 19 P.3d 1289, 1291-92 (2001), that the denial of the right to counsel of choice in a criminal case is structural error, State v. Cramer, 129 Hawaiʻi 296, 303, 299 P.3d 756, 763 (2013), and that the constitutional right to private counsel of choice should extend to termination of parental rights (**TPR**) cases.

Here, the Family Court denied Father's request to continue trial for Graf to prepare because trial had already been

---

[3]  Father's opening brief, in the points of error and argument sections, fails to properly cite to the record for asserted facts, which makes addressing the issues very difficult.  We address Father's contentions and arguments to the extent they are discernable from our review of the record.

continued for six months and the Children had been in foster care for over four years.  Father contends the Family Court erred by failing to weigh the countervailing government interests identified in <u>Cramer</u>.  Even assuming *arguendo*[4] the right to private counsel of choice extends to TPR cases, "the interests implicated by criminal and termination of parental rights cases are substantially different.  Most notably, termination of parental rights proceedings implicate the interests of the child in having a prompt and permanent resolution of his or her custody status –- a factor that is absent in the criminal context."  <u>In re RGB</u>, 123 Hawaiʻi 1, 26, 229 P.3d 1066, 1091 (2010).  Accordingly, the Family Court did not abuse its discretion by denying the continuance based on the length of time the Children had been in foster care.

As to Father's alternative request to be represented by both counsel without a continuance, we reject Father's position that he was entitled to continued representation by court-appointed counsel free of charge even if he retained additional, private counsel.  <u>Cf.</u> <u>State v. Mickle</u>, 56 Haw. 23, 27, 525 P.2d 1108, 1111 (1974) (holding that a criminal defendant is entitled to a court-appointed attorney as an indigent defendant if he or she "is unable to obtain counsel without substantial hardship to himself or his family").

Accordingly, the Family Court did not abuse its discretion in denying Father's request for a continuance, or in the alternative, to be represented by both appointed and privately retained counsel.[5]

---

[4] In light of our obligation to abstain from deciding novel constitutional issues where unnecessary, <u>Hawaii Gov't Employees Ass'n v. Lingle</u>, 124 Hawaiʻi 197, 208, 239 P.3d 1, 12 (2010), we decline to address whether the right to private counsel of choice extends to TPR cases because, even if such a right exists, the Family Court did not violate it.

[5] In conjunction with this argument, Father appears to contest the Family Court's denial of his oral request at trial for a continuance to allow him time to pursue reunification therapy.  We construe this point as arguing that the Family Court erred in prematurely terminating his parental rights, which we address *infra*.

**(2)** We review Father's challenges to the Family Court's FOFs for clear error and its COLs *de novo*. Fisher v. Fisher, 111 Hawaiʻi 41, 46, 137 P.3d 355, 360 (2006). FOFs are clearly erroneous when: (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, we are nonetheless left with a definite and firm conviction that a mistake has been made. Id. "'Substantial evidence' is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id.

Father challenges FOF 96, which provides, in part: "When the Court awarded temporary foster custody of the Children to the DHS in the FC-DA cases on September 23, 2016 . . . . Father caused [Child 1] to reside with his aunt . . . . Father did not cooperate with the DHS' requests to contact [aunt] to turn over [Child 1] to the DHS." He contends there is no evidence he did not cooperate in locating Child 1. However, the September 2016 Safe Family Home Report states that "DHS requested [Father] to contact his aunty to turn over [Child 1] to the DHS. [Father] did not cooperate with the request or returned [sic] the DHS' calls/texts." Therefore, FOF 96 is not clearly erroneous.

Father challenges FOFs 98, 99, 113, and 117,[6] which state:

> 98.  Based on the credible evidence in the record, and drawing all reasonable inferences from the credible evidence, the Children know that Father and Mother are their parents. However, the Children's attachment figures, who they look to for, and who they believe will provide them with physical and emotional security and stability are [the Resource Care Givers (**RCGs**)].

> 99.  The Children's statements to their guardian ad litem, Mr. Nagamine [(**GAL**)], the DHS, Dr. Steven Choy, Ph.D., who conducted the mental health assessments of the Children, and the Children's respective therapists is that they want to continue to reside with the [RCGs] and do not want to live with either parent is credible, and the Court so finds.

---

[6]  Although Father cites FOF 115, based on his argument, it appears Father intended to challenge FOF 117.

. . . .

113. After being taken into foster care and being placed in the safe and stable home of the [RCGs], [Child 1] felt safe to make disclosures about the conditions in family home before the September 2016 removal, such as being hit by Father and being afraid of Father.

. . . .

117. [Child 1] has consistently stated that she wants to continue to live with [the RCGs, who are] her maternal grandparents, and that she does not want to live with Father.

Father contends: there is no evidence that the RCGs are the Children's "only sources of secure attachment" or that Child 1 felt safe to disclose Father's abuse only after being removed from the family home; there is no basis to judge the Children's credibility because the Family Court declined to meet with the Children; and Child 1 told Father she wants to live with him. The record contains multiple independent sources supporting the challenged findings, including reports by the GAL and Mary Greaney (**Greaney**), one of the Children's therapists. See State v. Kwong, 149 Hawaiʻi 106, 112, 482 P.3d 1067, 1073 (2021) ("It is for the trial judge as fact-finder to assess the credibility of witnesses and to resolve all questions of fact; the judge may accept or reject any witness's testimony in whole or in part."). Thus, FOFs 98, 99, 113, and 117 are not clearly erroneous.

Father challenges FOFs 101 and 102, which state:

101. Throughout the pendency of this case, Father alleged that the [RCGs] have coached and/or coerced the Children to make negative statements about Father, such as Father's negative statements and conduct during visits, and to tell their therapists, their GAL and the DHS that they want to live with the [RCGs].  Based on the credible reports of Dr. Choy and the expert testimony of [Child 1]'s therapist, Dr. Borofsky, and [Child 2] and [Child 3]'s therapist, Gina Eustaquio, [Licensed Mental Health Counselor], in their opinions, the Children are not being coached and/or coerced.  Father's allegations about the [RCGs] coaching/coercing the Children are not credible.

102. Since the Children's placement with the [RCGs], Father has made negative allegations about the [RCGs] during the pendency of this case.

(Footnote omitted.)  Father contends there is no evidentiary basis for FOF 101 because the RCGs did not testify, and the other

evidence is not substantial.  The Family Court relied on multiple credible reports and testimony and FOF 101 is not clearly erroneous.  <u>Kwong</u>, 149 Hawaiʻi at 112, 482 P.3d at 1073.  As to FOF 102, Father admits to making negative allegations about the RCGs but contends the allegations were proven true.  Even if true, this does not render FOF 102 clearly erroneous.

Father challenges FOFs 106, 107, and 108, which state:

> 106. Father's testimony that [RCGs' son] was again living in the [RCGs'] home because [Child 2] told that [sic] him that [RCGs' son] was living in the [RCGs'] home is not credible.

> 107. At trial, Father testified that the [RCGs] were allowing Mother to have unauthorized visits with the Children, such as visits at the [RCGs'] home, including unsupervised visits.  According to the credible reports of the DHS and the credible testimony of the DHS [Child Welfare Services (**CWS**)] worker Ms. Ober, the [RCGs] do not allow Mother to be at their home, and that Mother is only given telephonic or virtual visits.  Further, according to Ms. Ober's credible testimony, [maternal grandmother] keeps a log documenting Mother's and Father's contact with the children, but Ms. Ober had not viewed the logs recently (at the time of the April 2021 trial proceedings).  There is no credible evidence corroborating Father's allegations, such as statements made by the Children to the DHS, the GAL, or their respective therapists.  Father's testimony in this regard is not credible.

> 108. Father's testimony that the [RCGs] were having marital problems and were in the process of obtaining a divorce, and that the [RCGs'] daughter and her family were living in the [RCGs'] home is not credible.

(Footnote omitted.)  Father contends the record lacks any basis to find his allegations are not credible because they were not refuted.  Though his allegations were not refuted, they were also not corroborated, and the Family Court is free to weigh the evidence and assess credibility.  <u>Kwong</u>, 149 Hawaiʻi at 112, 482 P.3d at 1073.  Thus, FOFs 106-108 are not clearly erroneous.

Father Challenges FOFs 127, 128, 136, 137, 142, and 147, which state:

> 127. Based on the credible reports and expert testimony of Ms. Greaney, [Child 2] suffered from trauma symptoms caused by the trauma she suffered when she resided with Father and Mother.  Said trauma includes being hit by Father and witnessing Mother having sex.

128. Per Ms. Greaney, [Child 2] has a negative attachment with Father, although she generally enjoyed visits with Father.

. . . .

136. [Child 2] is indifferent about having visits with Father and Mother.

137. During the March 11, 2021 virtual visit with Father, [Child 2] told Father that she did not want to live with him, and that she wanted to live with her maternal grandparents, the [RCGs].  In response to Father's question, [Child 2] denied that she was being coached.  Father became upset and told [Child 2] that he would not be seeing her anymore if this was the case.  [Child 2] was upset about Father's statement.  [Child 2]'s account of the March 11, 2021 virtual visit is credible, and Father's testimony denying this account of the March 11, 2021 virtual visit is not credible.

. . . .

142. Per Ms. Greaney, [Child 3] does not have a strong attachment with Mother or Father.

. . . .

147. [Child 3] is indifferent about having visits with Father and Mother.

Father contends there is insufficient evidence that he hit Child 2, that Child 2 has a negative attachment towards him, that Child 3 lacks a strong attachment to him, or that Child 2 and Child 3 are indifferent about having visits with him because reports indicate that they enjoy the visits.  He contends Greaney had to be removed from the case because she was resistant to reunification, and there is no basis to find that his account of the March 11, 2021 virtual visit was not credible because it was not refuted.

FOFs 127, 128, and 142 come directly from Greaney's October 7, 2020 trial testimony based on her time with Child 2 and Child 3, and FOFs 136, 137 and 147 come directly from therapist Gina Eustaquio's (**Eustaquio**) March 30, 2021 Play Therapy Summary Report and her April 21, 2021 trial testimony based on her sessions with Child 2 and Child 3.  Therefore, Father's contention there was insufficient evidence to support these findings is without merit.

7

With regard to Father's visits, Eustaquio testified that both Child 2 and Child 3 have expressed they like talking to Father and seeing Father "but it's ok if they don't too." Eustaquio further testified that for Child 2 and Child 3, "[i]f it happens, okay.  If not, it's okay[,]" and "[i]t's not like they're waiting for this call to happen."  Moreover, Father's denial of Child 2's account of the March 11, 2021 virtual visit is refuted by Eustaquio's March 30, 2021 report and trial testimony in which Eustaquio explained the details of Child 2's account of the visit and how it made Child 2 feel.

Further, Greaney was removed from the case because she had scaled down her practice and would not be able to assist with reunification therapy.  Thus, FOFs 127, 128, 136, 137, 142, and 147 are not clearly erroneous.  Kwong, 149 Hawaiʻi at 112, 482 P.3d at 1073.

Father challenges FOFs 149, 150, 152, 153, 157, and 159, which state:

> 149. Based on the information available at the beginning of the case, the Children were subjected to neglect, threat of abuse and the threat of neglect by the acts and/or omissions of Father and Mother due to Father's and Mother's mutual [Hawaii Revised Statutes (**HRS**)] Chapter 586 temporary restraining orders against each other, in which both included the Children, thereby leaving the Children without a legal caretaker.  Based on the credible evidence, the harm and threatened harm to the Children was not solely based on the Children not having a legal caretaker caused by the mutual temporary restraining orders.
>
> 150. [Child 1] and [Child 2] were exposed to violence between Father and Mother, but [Child 3], who lived with Father and Mother from her birth to when she was 13 months old, does not have any cognitive memory of the violence between Father and Mother. During the DHS' initial investigation and assessment of the family, Father and Mother both denied being the aggressor during the incidents of violence between them in the family home, and accused each other of coaching/coercing [Child 1] and [Child 2] about making statements about the violence in the family home. [Child 1] stated that Mother hit Father, but Father did not hit Mother.  [Child 2] stated that when Father hit Mother, she felt scared and [Child 1] took her and [Child 3] upstairs.
>
>             . . . .

8

152. During the DHS' initial investigation, [Child 1] stated that she was not afraid of Father and wanted to "stay" with Father.  However, during therapy with Dr. Amelia Borofsky, Psy.D., [Child 1] stated Father used to physically hit her and that she was afraid of him.  The Court finds Dr. Borofsky's report and testimony about [Child 1]'s disclosure to be credible, and the Court so finds.

153. During therapy with Ms. Greaney, [Child 1] disclosed that she found Mother after Mother's two suicide attempts, and that Father was mad at [Child 1] for not watching Mother.  [Child 1]'s disclosure to Ms. Greaney, as stated in Ms. Greaney's reports and in her testimony is credible, and the Court so finds.

. . . .

157. Based on the credible evidence of the care [Child 1] and [Child 2] received while the Children were residing with Father and Mother, [Child 1]'s and [Child 2]'s exposure to violence between Father and Mother, and Mother and especially Father's use of inappropriate physical discipline, and drawing all reasonable inferences, [Child 1] and [Child 2] suffered trauma while they were living with Mother and Father which affected their present ability to function, and the Children were subject to threatened harm.

. . . .

159. Father's problems/safety issues that subjected the Children to harm and threatened harm, and that prevent him from providing a safe home for the Children are domestic violence, the use of inappropriate physical discipline and inappropriate parenting skills.  At the beginning of the case, the DHS had concerns about Father's use of marijuana, which Father stated was for medicinal purposes.  At the time of trial, the use of marijuana did not appear to be a concern.

Father contends the claimed exposure to violence was not corroborated, there is no basis to determine Dr. Amelia Borofsky's (**Dr. Borofsky**) credibility, regarding FOF 153 there is no credible evidence that Father was actually angry with Child 1, and the DHS-assigned social worker, Tracy Ober (**Ober**), testified that Father's only safety issues were parenting ability, anger, and general counseling.

These FOFs concern the safety issues that subject the Children to harm, or threat of harm, and Father's inability to provide a safe home for the Children, which are the basis for DHS's petition for foster custody; these findings are supported

by DHS's independent investigation and interviews of Child 1 and 2.  The Family Court acted within its discretion in accepting Dr. Borofsky's testimony.  Kwong, 149 Hawai'i at 112, 482 P.3d at 1073.  Thus, FOFs 149, 150, 152, 153, 157, and 159 are not clearly erroneous.

Father challenges FOFs 160, 166, and 170-172, which state:

> 160. Father completed a parenting education program, but his behavior does not follow what was taught in the class.
>
> . . . .
>
> 166. Father's conduct during visits raised a significant concern about his ability to safely and appropriately parent the Children, and to empathize with the Children's feelings.
>
> . . . .
>
> 170. During the March 20, 2019 visit, while walking to the park, [Child 1] and [Child 2] went to the restroom.  Father asked them where they wanted to live and recorded their responses on his cell phone. Both [Child 1] and [Child 2] told the visitation specialist not to address the situation with Father because they were afraid of how he would react.
>
> 171. During this period, Father told [Child 2] and [Child 1] that he would move away if they do not want to live with him.
>
> 172. Father's conduct in questioning [Child 1] and [Child 2] and where they wanted to live and recording their responses and his statement that he would move away if they do not want to live with him caused [Child 1] and [Child 2] to be distressed, and increased their negative feelings.

Father contends the DHS social worker did not testify about what was covered in the class and where Father was deficient, the overwhelming majority of visits with the Children were positive, and there is insufficient evidence that he filmed the Children and threatened to move away if the Children did not want to live with him.

Even if Father completed a parenting class, he must be able to demonstrate what he learned, and the record contains many examples that his parenting skills are, at times, inappropriate, despite that his interactions were primarily positive.  Further,

FOFs 170, 171, and 172 are supported by the Ohana Time Observation Forms for the March 20, 2019, and April 3, 2019 visits and Greaney's April 1, 2019 Treatment Update, which describe Child 1 and Child 2's reports to the Ohana Time Supervisor and Greaney of Father's conduct. Thus, Father fails to demonstrate that FOFs 160, 166, 170, 171, and 172 are clearly erroneous.

Father challenges FOF 163, which states:

> 163. Father's September 2018 psychological evaluation has inconsistencies and/or omissions. In his self-report during the evaluation, Father did not mention/disclose the violence between him and Mother, and he stated that he used time-outs to discipline the Children. As stated above, [Child 1] and [Child 3][7] credibly disclosed Father's violent conduct towards Mother, and Father's use of physical discipline which resulted in both [Child 1] and [Child 2] being afraid of Father.

Father contends the psychiatrist who conducted his psychiatric assessment knew about the allegations of domestic violence and yet recommended minimal need for counseling and the importance of reunification with Father. Even if true, Father did not disclose these allegations in his self-report; thus, he fails to show FOF 163 is clearly erroneous.

Father challenges FOF 164, which states:

> 164. Throughout the pendency of this case, Father has not consistently participated in visits with the Children. He missed scheduled visits or failed to confirm visits, and was late for visits. Father's inconsistency in visiting with the Children raises concerns about his ability to manage his time, especially if the Children were returned to his care.

Father contends DHS is to blame for the inconsistent visits because DHS repeatedly denied visits if Father did not confirm on time and denied face-to-face visits in the year preceding trial due to Covid.

Father agreed to confirm visits as part of his visitation agreement with DHS, Father missed many visits due to his failure to confirm, and DHS's denial of face-to-face visits

---

[7] We note that the Family Court appears to have mistakenly identified Child 3 where the court intended to identify Child 2.

due to Covid concerns did not cause his inconsistent visits. Substantial evidence supports FOF 164.

Father challenges FOF 174, which provides:  "174. Father was informed of the Children's activities and was invited to attend the activities.  [Child 1] did not want Father to attend her activities."  He contends the RCGs and DHS refused to tell him about these activities.  This argument is contradicted by FOF 175, which states that "Father testified that he did not attend activities due to the fact that he was not provided with a schedule.  Father's testimony on this issue is not credible."  As FOF 175 is unchallenged, it is binding on the court.  See In re Doe, 99 Hawaiʻi 522, 538, 57 P.3d 447, 463 (2002) (unchallenged findings of fact are binding on appeal).  Thus, FOF 174 is not clearly erroneous.

Father challenges FOFs 190, 193, and 194, which state:

> 190. Father testified that he did not request assistance from DHS in seeking a therapist as he felt in the past he requested assistance and he did not receive any help.  Father further testified that he is now willing to accept assistance from DHS.
>
> . . . .
>
> 193. Based on the credible expert testimony of DHS CWS unit supervisor Ms. Soria, and the Court so finds, from January 2021 to April 2021, Father failed to inform the DHS about his problems with finding a new therapist and his need for assistance from the DHS.  Further, according to Ms. Soria, the DHS would have assisted Father in finding a new therapist, and would have recommended the Waianae Coast Comprehensive Health Center because Father was now living on the Leeward Coast.  He did not call the Waianae Coast Comprehensive Health Center when he was looking for a new therapist.
>
> 194. While the DHS could have reached-out to Father to inquire about his efforts to find a new therapist and to offer its assistance to Father, Father also bears responsibility to ask for assistance from the DHS, either directly or through his counsel.

Father contends he always welcomed DHS's assistance in securing a therapist; Ober's supervisor, Debbie Soria (**Soria**), testified she was aware in January 2021 that Father had not been able to secure a therapist; and Graf informed the Family Court in April 2021

that she was assisting Father in securing a therapist.  However, Ober and Soria testified that neither Father nor Father's counsel contacted DHS for assistance in finding a therapist.  Father has not demonstrated that FOFs 190, 193, and 194 are clearly erroneous.

Father challenges FOFs 198, 203, 204, 205, and 206, which state:

> 198. Under the circumstances presented by the case, [Father] and [Mother] were given every reasonable opportunity to demonstrate positive changes and able [sic] to provide a safe family home and to reunify with the Children.
>
> . . . .
>
> 203. Under the circumstances presented in this case, the DHS made reasonable efforts to prevent or eliminate the need to remove the Children from the family home.
>
> 204. Each of the service plans offered by the DHS and ordered by the Court were fair, appropriate, and comprehensive.
>
> 205. Under the circumstances presented by this case, the DHS has exerted reasonable and active efforts to reunify Father and Mother with the Children by identifying necessary, appropriate and reasonable services to address the identified safety issues/problems, and by making appropriate and timely referrals for these services.  Any delays in the delivery of services were due to Father's and Mother's conduct.
>
> 206. Under the circumstances presented in this case, the DHS treated Father and Mother fairly and serviced the entire family since the inception of DHS and Family Court intervention with this family.

Father contends that:  DHS did not give him every opportunity to demonstrate positive changes because Ober did not communicate with him and repeatedly blocked him from having visits; DHS should have advocated for dismissal of Mother's "retaliatory" temporary restraining order so the Children would not have been left without a caretaker; the Family Court had to order DHS to provide Father a referral for a psychological exam; DHS's referrals were untimely; and though Father completed his services, DHS made it "impossible" to demonstrate his parenting abilities because it denied face-to-face visits due to the Covid

13

pandemic.  Father also[8] argues that:  DHS repeatedly denied Father reasonable visitation with the Children and there were virtually no visits from September 2016 to April 2017; it was "draconian" for DHS to require a confirmation call or the visit would be cancelled; Father consistently objected to DHS's reasonable reunification efforts; and it was unreasonable for DHS to keep the Children in therapy for so long without a therapy goal of reunification.

These arguments concern DHS's reasonable reunification efforts under HRS § 587A-2 (2018).  "DHS is under an obligation to provide a reasonable opportunity to parents through a service plan to reunify the family" and "to make reasonable efforts to reunite parent and child."  In re Doe, 100 Hawaiʻi 335, 343, 60 P.3d 285, 293 (2002) (interpreting HRS Chapter 587, the predecessor to HRS Chapter 587A).  An objection to DHS's reasonable efforts or a claim for additional services must be timely made or the issue is waived.  Id. at 343-44, 60 P.3d at 293-94.

Father provides no authority supporting his argument that DHS was obligated to advocate for dismissal of Mother's temporary restraining order, and DHS confirmed the threat of harm by Father independent of Mother's temporary restraining order. See FOF 149.

Father raised the issue of visitation in December 2016 for the holidays and Child 2's birthday, but because he also raised safety issues regarding placement with the RCGs, the Family Court ordered that DHS's investigation into placement would have priority over visitation.  In January 2017, DHS confirmed that the RCGs' home was safe, but Father did not raise the issue of visitation again until a March 2017 hearing.  Thereafter, Father attended three out of a possible twenty-five

_____

[8]  Father's arguments concerning FOFs 198, 203, 204, 205, and 206 and generally concerning DHS's reunification efforts, including visitation and services, come from both the Points of Error and Argument sections of his Opening Brief.

14

visits and did not raise the issue of visitation again until DHS filed the Motion to Terminate in December 2017.  Despite the pending Motion to Terminate, Father remained inconsistent with visits throughout the case.  Thus, the record does not demonstrate that DHS caused Father's lack of visits with children.

Father fails to explain how it is impossible to demonstrate his parenting abilities to DHS's satisfaction electronically via "Zoom"; moreover, Father consistently missed both face-to-face and Zoom visits with the Children due to his failure to show up or to call to confirm.

The Children's therapists testified that the Children would not respond positively to reunification therapy.  Father agreed to DHS's policy of requiring confirmation calls prior to visits, and he provides no authority for his assertion that the requirement is unreasonable or "draconian."

Father's argument that DHS failed to provide a timely referral for a psychological exam has some support.  Notably, Father indicated a willingness to complete services only after DHS filed its Motion to Terminate his parental rights.  At a hearing on February 16, 2018, the Family Court ordered DHS to make referrals.  At a hearing on July 5, 2018, Father subsequently complained about not receiving a referral for a psychological assessment, and Ober represented that it was not required by the current service plan, but that DHS would make the referral anyway.  Ober appears to have misstated or misread the service plan, which required "Psychological Evaluation and all recommended services (if recommended by or in consultation with clinical psychologist)."  Thus, it appears DHS delayed for five months in referring a psychologist, and we therefore strike as clearly erroneous the portion of FOF 205 finding that "Any delays in the delivery of services were due to Father's and Mother's conduct."  However the Family Court continued the trial at Father's request based on the results of his psychological assessment, and trial ultimately did not commence for a further

15

two years.  Thus, DHS's delay in referring a psychologist did not prejudice Father and the delay was due in part to Father's conduct as well.

Thus, FOFs 198, 203, 204, 206, and the remaining portion of 205 are not clearly erroneous.

Father challenges FOFs 207, 208, and 210, which state:

> 207. None of the underlying facts and data upon which the DHS based its opinions, assessments and recommendations were shown to be unreliable or untrustworthy.  The DHS' continuing assessments in this case were conducted in an appropriate manner.

> Witnesses

> 208. The expert testimony of the DHS Child Welfare Services worker Tracy Ober, testifying on behalf of DHS, is credible.

> . . . .

> 210. The expert testimony of Mary Greaney, [Licensed Marriage and Family Therapist] is credible.

He contends Ober was not credible because the Family Court ordered her supervisor to be present at all hearings, and Greaney was not credible because she was ordered off the case.

The Family Court ordered Ober's supervisor to attend future hearings to address potential concerns as to whether DHS's actions are appropriate.  The Family Court ordered Greaney off the case because she would not be able to assist with reunification therapy as she had scaled down her practice.  Neither action relates to credibility, and we decline to reassess witness credibility.  In re Jane Doe, 95 Hawaiʻi 183, 196-97, 20 P.3d 616, 629-30 (2001).  Thus, FOFs 207, 208, and 210 are not clearly erroneous.

**(3)** Father challenges FOFs 196 and 197, and COLs 19 and 20, which state:

> 196. [Father] and [Mother] are not presently willing and able to provide the Children with a safe family home, even with the assistance of a service plan.

> 197. It is not reasonably foreseeable that [Father] and [Mother] will become willing and able to provide the Children with a safe family home, even with the assistance of a service plan.

. . . .

<u>Conclusions of Law</u>

. . . .

19. The Children's legal mother, legal father, adjudicated, presumed, or concerned natural father, as defined under HRS Chapter 578, are not presently willing and able to provide the Children with a safe family home, even with the assistance of a service plan.

20. It is not reasonably foreseeable that the Children's legal mother, legal father, adjudicated, presumed, or concerned natural father, as defined under HRS Chapter 578, will become willing and able to provide the Children with a safe family home, even with the assistance of a service plan, within a reasonable period of time.

Father contends his only remaining safety issue was his parenting abilities, which he was unable to demonstrate because he was not allowed face-to-face visits due to Covid, and that it was foreseeable he would be able to demonstrate his parenting ability because he completed all other required services.  He also contends[9] it was premature to terminate his parental rights because he should have been afforded more time to find a therapist for reunification therapy, DHS failed to refer a therapist, and Dr. Borofsky testified that he would not need his own therapist to facilitate reunification therapy thus Father could have started reunification therapy without delay.

These arguments relate to HRS § 587A-33(a) (2018), which provides the following standard for termination of parental rights:

(a) At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:

(1) A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child with a safe family home, even with the assistance of a service plan;

(2) It is not reasonably foreseeable that the child's parent whose rights are subject to termination

---

[9] Father's arguments concerning his willingness and ability to provide a safe family home with the assistance of a service plan come from both the points of error and the argument section of his Opening Brief.

will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care; [and]

> (3) The proposed permanent plan is in the best interests of the child. In reaching this determination, the court shall:

> > (A) Presume that it is in the best interests of the child to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home; and

> > (B) Give greater weight to the presumption that the permanent plan is in the child's best interest, the younger the child is upon the child's date of entry into foster care[.]

Assuming *arguendo* Father's only remaining safety issue was parenting ability, as discussed, Father fails to explain how it is impossible to demonstrate parenting skills via Zoom visits where the record indicates his primary parenting issues are consistency and appropriateness during visits, which Father could demonstrate by attending all Zoom visits and remaining appropriate with his Children during visits.  The case had been pending for over four years, which is more than two years beyond the statutory maximum, and in that time, Father has failed to consistently demonstrate his parenting ability through consistent and appropriate visits.  Thus, there was substantial evidence from which the Family Court could find by clear and convincing evidence that it was not reasonably foreseeable Father would become willing and able to provide a safe family home, even with the assistance of a service plan, within two years after placement.  FOFs 196 and 197 are not clearly erroneous, and COLs 19 and 20 are not wrong.

For these same reasons, we also conclude that the Family Court did not abuse its discretion in denying Father's oral request at the conclusion of DHS's case for a continuance of trial for Father to pursue reunification therapy.

**(4)** There is clear and convincing evidence the Permanent Plan was in the Children's best interest.  Father challenges FOFs 199-201 and COLs 21-24, which state:

> 199. Having made the HRS § 587A-33(a)(1) and (2) "parental unfitness" findings of fact, by clear and convincing evidence, the Court makes the following findings of fact regarding the Permanent Plan, dated February 13, 2020, pursuant to HRS § 587A-33(a)(3).
>
> 200. The permanency goal of the February 13, 2020 Permanent Plan is adoption.  The permanent plan goal of adoption is in accord with the HRS § 587A-32(a)(3) [sic] presumption that the goal of adoption is in the Children's best interests.
>
> 201. The Permanent Plan, dated February 13, 2020, with the permanency goal of adoption, is in the Children's best interests.
>
> . . . .
>
> <u>Conclusions of Law</u>
>
> . . . .
>
> 21. Having made conclusions of law pertaining to "parental unfitness" pursuant to HRS § 587A-33(a)(1) and (2), the Court makes the following conclusions of law regarding the Permanent Plan, dated February 13, 2020, pursuant to HRS § 587A-33(a)(3).
>
> 22. The permanent plan goal of adoption is presumed to be in the child's [sic] best interests. HRS § 587A-32(b)(1) [sic].
>
> 23. The HRS § 587A-33(a)(3)(A) presumption that it is in the Children's best interests to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home has increased in importance because [of] the Children's respective ages at the time of their November 22, 2016 Date of Entry Into Foster Care.  HRS § 587A-33(a)(3)(B).
>
> 24. The Permanent Plan, dated February 13, 2020, with the permanency goal of adoption, is in the best interests of the Children.

Father contends only that the Permanent Plan was not in the Children's best interest because he was not afforded a reasonable opportunity for reunification.  Father's argument does not demonstrate error as to the Family Court's determination regarding the Children's best interests.  The Family Court's determination regarding the best interest of the Children is in

19

accord with the statutory presumptions in HRS § 587A-33(a)(3)(A) and (B), and the record in this case.

Based on the foregoing, we affirm the following, entered in the Family Court of the First Circuit: (1) the April 30, 2021 Decision and Order Re: Motion to Terminate Parental Rights; and (2) the June 24, 2021 Findings of Fact and Conclusions of Law, with the exception of the portion of FOF 205 finding that "Any delays in the delivery of services were due to Father's and Mother's conduct[,]" which we hold is erroneous, but was harmless error.

DATED:  Honolulu, Hawaiʻi, June 27, 2022.

On the briefs:

Jacob G. Delaplane
for Father-Appellant

Patrick A. Pascual,
Julio C. Herrera,
Erin K.S. Torres,
Ian T. Tsuda,
Deputy Attorneys General,
for Petitioner-Appellee

/s/ Lisa M. Ginoza
Chief Judge

/s/ Karen T. Nakasone
Associate Judge

/s/ Sonja M.P. McCullen
Associate Judge